### In re BAUSCH & LOMB, INC. SECURITIES LITIGATION.

### This Document Relates to All Actions.

### No. 94–CV–76270L.

United States District Court,
W.D. New York.

Oct. 24, 1996.

Timothy J. Perry, Sugarman, Wallace, Manheim & Schoenwald, Syracuse, NY, Mark C. Gardy, Lee Squitieri, Abbey & Ellis, New York City, Sandy Liebhard, Bernstein Liebhard & Lifshitz, New York City, Harold B. Obstfeld, Law Offices of Harold B. Obstfeld, New York City, for plaintiff JE & ZB Butler Foundation.

Timothy J. Perry, Sugarman, Wallace, Manheim & Schoenwald, Syracuse, NY, Mark C. Gardy, Lee Squitieri, Abbey & Ellis, New York City, Sandy Liebhard, Bernstein Liebhard & Lifshitz, New York City, for plaintiff Shmuel Muller.

Timothy J. Perry, Sugarman, Wallace, Manheim & Schoenwald, Syracuse, NY, for plaintiffs Murray Zucker, as Custodian for Lillian M. Zucker, Asbestos Workers Local Union II Defined Benefit Pension Plan and Allen Reichman.

Timothy J. Perry, Sugarman, Wallace, Manheim & Schoenwald, Syracuse, NY, Jon Plasse, Goodkind, Labaton, Rudoff & Sucharow, New York City, for plaintiff Eugene H. Feldman, IRA.

Louis D'Amanda, Chamberlain, D'Amanda, Oppenheimer & Greenfield, Rochester, NY, for plaintiff Henry Grossman.

Jules Brody, Stull, Stull & Brody, New York City, for plaintiff William Goresko.

Patricia A. Hulley, Bausch & Lomb Incorporated, Rochester, NY, John F. Savarese, David Gruenstein, Kevin S. Reed, David R. Lurie, Wachtell, Lipton, Rosen & Katz, New York City, for defendant Bausch & Lomb Incorporated.

Carolyn G. Nussbaum, Nixon, Hargrave, Devans & Doyle, Rochester, NY, Patricia A. Hulley, Bausch & Lomb Inc., Rochester, NY, John F. Savarese, David Gruenstein, Kevin S. Reed, Wachtell, Lipton, Rosen & Katz, New York City, for defendant Daniel E. Gill.

Carolyn G. Nussbaum, Nixon, Hargrave, Devans & Doyle, Rochester, NY, for defendants Ronald L. Zarella, Peter Stephenson, Alan H. Resnick, Stephen L. McCluski.

## AMENDED DECISION AND ORDER

LARIMER, Chief Judge.

This is a class action brought on behalf of persons who purchased Bausch & Lomb, Inc. ("B & L") common stock from October 13, 1993 through January 25, 1995. Plaintiffs allege that during that period, defendant B & L engaged in a scheme to mislead the investing public about its financial condition and its prospects for future sales and income. Plaintiffs allege that over a period of time beginning around June 1994, certain facts were revealed to the public which showed that B & L's sales were lower than B & L had reported and predicted them to be. As a result, the value of B & L stock—and hence of the plaintiffs' holdings—fell considerably.

Plaintiffs commenced this action on June 6, 1994. Defendants include B & L and five individuals ("the individual defendants"), all

of whom allegedly held the following positions within B & L during the relevant time periods: Daniel E. Gill, Chairman, Chief Executive Officer; Ronald L. Zarella, President and Chief Operating Officer; Peter Stephenson, Senior Vice President–Finance; Alan H. Resnick, Vice–President and Treasurer; and Stephen L. McCluski, Controller. The third amended complaint asserts two causes of action. The first, which is brought against all defendants, alleges securities fraud in violation of 10(b) of the Securities and Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. The second cause of action is brought against the individual defendants under § 20(a) of the Act, 15 U.S.C. § 78t(a), which provides for so-called "control person" liability.

Defendants have moved to dismiss the complaint pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6). Both B & L and the individual defendants contend that the allegations fail to state a claim for securities fraud because they fail to plead a strong inference of scienter, and that defendants' alleged misrepresentations do not state a claim for fraud because they were immaterial and were protected by the "bespeaks caution" doctrine. B & L also contends that plaintiffs' claims based on events prior to December 13, 1993 are barred by the statute of limitations. The individual defendants assert that certain claims against Zarella, Stephenson, Resnick and McCluski are barred by the statute of limitations, and that plaintiffs' allegations of control person liability are legally insufficient.

### PROCEDURAL BACKGROUND

The first complaint alleging securities fraud by B & L was filed on June 6, 1994. That action was filed on behalf of members of a putative class of plaintiffs who had purchased B & L stock between December 14, 1993 and June 3, 1994 ("the Class I period"). Defendant Gill was the only individual defendant named in that action.

Plaintiffs filed an amended complaint on November 21, 1994. Additional plaintiffs were named, but the defendants and class period remained the same as in the original complaint.

In September 1995, a second amended complaint was filed, which incorporated a second alleged class period that had been separately pleaded in *Grossman v. Bausch & Lomb,* 95–CV–6052L. The *Grossman* action had been commenced on January 31, 1995. *Grossman* asserted claims on behalf of a putative class of plaintiffs who had purchased B & L stock between June 4, 1994 and January 25, 1995 ("the Class II period"). The named defendants in *Grossman* included, for the first time, defendants Zarella, Stephenson, Resnick, and McCluski ("the additional individual defendants"). The second amended complaint also included these defendants. Pursuant to a case management order of this court governing this litigation, *Grossman* was consolidated with the instant case for purposes of trial on the day it was commenced.

On November 21, 1995, a third amended complaint was filed, which purported to extend the Class I period back in time to include claims on behalf of persons who bought B & L stock between October 13, 1993 and December 13, 1993. It is this complaint that is the subject of the present motions.

### FACTUAL BACKGROUND

The facts alleged in the complaint, which must be accepted as true for purposes of these motions are set forth in over forty pages of the complaint, but may be summarized as follows. B & L's revenues have for many years been heavily dependent on its sales of contact lenses and sunglasses. Prior to 1994, B & L experienced consistent growth and high levels of sales for both of these products.

By 1993, however, it allegedly became apparent to defendants that this growth could not continue. The complaint is less than clear why this was so, but there are indications in some B & L annual reports and other documents that economic conditions

and weak consumer demand in foreign markets was part of the problem.[1]

Plaintiffs allege that defendants concocted a scheme to conceal this declining growth from the investing community. One of the primary ways defendants did this, plaintiffs allege, was by issuing various types of public statements giving the appearance that B & L was enjoying high levels of sales and profits, when in fact those sales and profit figures had been inflated by "stuffing" B & L's distribution channels, i.e., by sending out far more products to its distributors than was actually justified by consumer demand. B & L representatives allegedly assured the distributors that any unsold products could be returned to B & L without cost, or that other arrangements would be made to the dealers' satisfaction. Defendants also allegedly recorded sales, or knew that sales were being recorded, based on faked invoices. In these instances, sales were attributed to nonexistent distributors and the products were then stored in B & L's own warehouses. Plaintiffs allege that through such devices, defendants were able to maintain an illusion of continued growth and prosperity.

This illusion, plaintiffs contend, was presented to the public through press releases reporting sales and revenue figures, reports to shareholders, Securities and Exchange Commission ("SEC") reports, and so on. These documents reported sales figures and concomitant growth that was far more favorable than was actually the case. These documents also made unjustifiably optimistic predictions about B & L's future prospects. As a result, B & L's stock price continued to rise.

Plaintiffs contend that defendants were aware of B & L's actual sales figures because B & L's distributors were required to download their weekly sales and inventory reports to B & L's computer system every week. They also allege that defendant Gill personally received sales reports filed by certain B & L representatives.

Despite their awareness of B & L's mounting difficulties, defendants continued to report favorable sales and revenue figures, and to make optimistic predictions for the future, until June 3, 1994. On that date, B & L announced publicly that its anticipated 1994 revenues would be decreased by $75 million because of inventory imbalances, which it attributed to slower than expected improvement in consumer demand. This announcement precipitated an immediate drop in the value of B & L stock, which fell $8 per share to $41⅞ per share.

Plaintiffs allege that even the June 3 announcement was deceptive. Even though the report was negative, it nevertheless omitted certain other negative information. For example, the announcement failed to state that B & L was going to reduce distributor inventories by repurchasing merchandise from its distributors, and that some of the merchandise previously reported as sales had never been paid for by the distributors.

On July 11, 1994, B & L announced that it had made substantial progress in reducing inventories, but that the inventory reduction program would have a negative impact on second-quarter earnings. On July 14, 1994, B & L announced earnings of $.55 per share, adding that it would probably take until 1995 to bring a return to "predictable growth." These announcements caused B & L's stock price to fall further to $34.25 per share.

B & L's next announcement came on August 3, 1994, when it revealed that it expected its 1994 earnings to be fifteen to twenty percent below the 1993 operating net of $3.21 per share before a charge of an expected $17 million resulting from B & L's cutting 1500 positions worldwide.

On August 9, 1994, B & L filed a Form 10-Q with the SEC for the quarter ended June 25, 1994. The Form 10-Q stated that B & L's consolidated revenues for the second quarter had increased one percent from the second quarter of 1993, and that net sales were up four percent over the previous year. The form also stated that as a result of

1. Although these documents are not literally part of the pleadings, they have been partially quoted in the complaint. Under these circumstances, it is proper for the court to consider the full text of the documents. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 808–09 (2d Cir.1996).

inventory imbalances, sales to date had been reduced or penalized by $30 million.

On October 3, 1994, B & L announced that it expected its 1994 earnings to fall fifteen to twenty percent compared to 1993, due primarily to inventory imbalances. Defendant Gill, however, said in the statement that he anticipated the inventory situation to "normalize," and that he expected strong growth in 1995.

On October 12, 1994, B & L announced a decline in revenues and net earnings due to its inventory reduction efforts. Revenues fell $49.4 million to $449.4 million for the third quarter compared to the same period in 1993.

B & L's Form 10–Q for the third quarter of 1994, issued on November 15, 1994, stated that "a new pricing and product return policy for distributors of traditional contact lenses in the U.S. ... will allow these distributors to return the excess portion of their unsold traditional lens inventories and eliminate the inventory imbalance in the U.S." The report admitted that excess inventory had resulted in a $5 million sales penalty during the third quarter.

On January 25, 1995, B & L announced its fiscal year 1994 earnings. This report also disclosed that the SEC was investigating B & L's accounting practices concerning the distributor inventory imbalance. B & L stated that "inappropriately recorded" sales had resulted in an apparent $10 million earnings gain in 1993.

The following day, an article in the *Wall Street Journal* stated that the SEC investigation had been triggered by a December 19, 1994 *Business Week* article. The *Business Week* story had reported that in late 1993, B & L pressured its distributors to buy $25 million worth of contact lenses at inflated prices, which represented half of the contact lens division's earnings for that year. *Business Week* also claimed that B & L had violated standard revenue recognition accounting principles in this process.

As a result of B & L's January 25 announcement, the price of its stock fell from $34.625 to $32.375 in one day. The complaint alleges that B & L's failure to disclose the nature, cause and magnitude of the inventory imbalance sooner had caused B & L's stock price to be artificially inflated, and that its decline when the truth became known caused substantial harm to plaintiffs.

## THE THIRD AMENDED COMPLAINT

Based on these allegations, plaintiffs assert two causes of action. Count 1 alleges that defendants violated 15 U.S.C. § 78j(b), which makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." Plaintiffs allege that defendants violated SEC Rule 10b–5, which was promulgated under § 78j, and which makes it unlawful

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Count 2 of the complaint is asserted against the individual defendants under 15 U.S.C. 78t(a), which provides that

> [e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

## DISCUSSION

### I. Allegation of Scienter

#### A. General Pleading Requirements

Rule 9(b), of course, requires "averments of fraud" and "the circumstances constituting fraud" to be pleaded "with particularity."

Defendants contend that plaintiffs' factual allegations do not meet the pleading requirements of Rule 9(b), particularly as that rule has been interpreted by the Second Circuit in securities fraud cases. In particular, defendants assert that plaintiffs have failed to allege facts showing that defendants acted with fraudulent intent.

"Securities fraud allegations under § 10(b) and Rule 10b–5 are subject to the pleading requirements of Rule 9(b)," *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir.1994), which requires that "the circumstances constituting fraud ... be stated with particularity." Fed.R.Civ.P. 9(b). A securities fraud "complaint making such allegations must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Shields*, 25 F.3d at 1127–28 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)).

With respect to the scienter element of fraud, the Second Circuit "require[s] plaintiffs to allege facts that give rise to a strong inference of fraudulent intent." *Shields*, 25 F.3d at 1128. "In order to establish scienter for the fraud claim, the plaintiffs must either (1) identify circumstances indicating conscious or reckless behavior by the defendants, or (2) allege facts showing a motive for committing fraud and a clear opportunity for doing so." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 813 (2d Cir. 1996).

Although the alleged facts must give rise to a strong inference of fraudulent intent, however, and "though specificity is required with respect to .the statements that are alleged to have been fraudulent," *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir.1994), the provision in Rule 9(b) that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally" means that "'great specificity [is] not required with respect to ... allegations of ... scienter.'" *Id.* at 1173 (quoting *Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir.1987)). The reason for this is that "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Fluor*, 808 F.2d at 962.

In addition, Rule 9(b) must be read in conjunction with Rule 8(a), which requires "a short and plain" statement of the claims. *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987).

> Rule 9(b) cannot be viewed in vacuo. "The requirement of particularity does not abrogate Rule 8, and it should be harmonized with the general directives ... of Rule 8 that the pleadings contain 'a short and plain' statement of the claim or defense and with each averment should be 'simple, concise, and direct.' Rule 9(b) does not require nor make legitimate the pleading of detailed evidentiary matter."

*Ross v. A.H. Robins Co.*, 607 F.2d 545, 557 n. 20 (2d Cir.1979), (quoting 2A Moore's Federal Practice, ¶ 9.03 at 1929–30), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).

The Second Circuit has also held that the general rule that fraud pleadings cannot be based upon information and belief does not apply when the facts are peculiarly within the opposing party's knowledge. Such facts may be alleged upon information and belief provided that they are accompanied by a statement of the facts upon which the belief is based. *DiVittorio*, 822 F.2d at 1247. Moreover, "[a]llegations of scienter are not subjected to the more exacting consideration applied to the other components of fraud." *Ouaknine v. MacFarlane*, 897 F.2d 75, 81 (2d Cir.1990).

Nevertheless, the Second Circuit has cautioned courts not to "mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations.'" *Acito v. IMCERA*

*Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995) (quoting *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990)). Therefore, "plaintiffs have the 'burden of pleading circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter.' Such a basis may be shown through allegations of a motive to deceive and access to accurate information." *Cohen,* 25 F.3d at 1173–74 (quoting *Fluor,* 808 F.2d at 962).

## B. Sufficiency of Plaintiffs' Allegations

█ In the case at bar, plaintiffs allege that they have adequately pleaded scienter by pleading both conscious or reckless behavior by the defendants, and by pleading motive and opportunity. First, they allege that defendants' sanguine statements about B & L's financial condition, which were based upon dealer inventories that defendants knew had been overstocked, constituted reckless behavior that was known to and caused by the individual defendants. Plaintiffs allege that defendants' involvement in the day-to-day affairs of B & L, and their access to information concerning B & L's sales, suffice at this stage to support an allegation of conscious or reckless behavior on their part.

Plaintiffs also assert that they have pleaded sufficient facts to show that defendants had a motive and clear opportunity to commit fraud. Plaintiffs contend that defendants' motive to commit fraud stemmed from a combination of factors. One of these, plaintiffs claim, was defendant Gill's compensation package, which included incentive pay tied to B & L's performance; the better B & L did, the greater the bonus that Gill would receive. Plaintiffs also contend that defendants sought to inflate B & L's stock price in order to increase the value of defendants' own holdings of B & L stock. Plaintiffs allege that defendants' sales of some of their stock during the class periods is evidence of defendants' motive in this regard.

Plaintiffs further allege that defendants were motivated by a desire to protect their own positions and prestige within B & L. Plaintiffs claim that defendants also sought to conceal their own wrongdoing in order to avoid being held responsible for their actions.

Defendants contend that plaintiffs have not pleaded sufficient facts indicating that defendants knew that, or recklessly disregarded whether, their optimistic predictions were false. Defendants assert that plaintiffs have pointed to no documents or information in defendants' possession that would demonstrate such conscious or reckless behavior. At most, defendants contend, the evidence suggests only that some low-level B & L employees submitted inflated sales figures to company management, who were themselves deceived by those employees.

In assessing these contentions and the sufficiency of the complaint, however, the court must bear in mind that this is a motion to dismiss, not a motion for summary judgment. On a motion to dismiss, the allegations made in the complaint *must* be accepted as true. *See O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 677 (2d Cir.1991) (motion to dismiss under Rule 9(b)); *Easton v. Sundram,* 947 F.2d 1011, 1014–15 (2d Cir. 1991), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992) (motion to dismiss under Rule 12(b)(6)). In addition, the allegations must be "construed favorably to the plaintiff." *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); *see also Pentland USA, Inc. v. Millfeld Trading Co.,* 841 F.Supp. 1383, 1385 (S.D.N.Y.1993) (on motion to dismiss securities fraud case, court must read complaint generously, and draw all inferences in favor of plaintiff).

Under the pleading standards set forth by the second Circuit, I find that the allegations of the complaint are sufficient to allege scienter based upon defendants' alleged conscious or reckless behavior. The complaint expressly alleges that defendants knew that B & L's distributors were becoming overloaded with inventory and that they concealed this fact in various documents, including press releases and financial statements. Defendants are also alleged to have known that some of B & L's financial statements overstated B & L's sales and revenue figures, which eventually had to be revised downward after the truth came out. Plaintiffs further allege that defendants knew or should have known that the inventory imbalance could not be corrected without reducing B & L's

revenues and profits. If true, these allegations at the very least would support a finding of recklessness on defendants' part. *See Breard v. Sachnoff & Weaver, Ltd.,* 941 F.2d 142, 144 (2d Cir.1991) (scienter for § 10(b) purposes includes recklessness).

In addition to these allegations, plaintiffs allege that even when B & L publicly acknowledged its inventory imbalance, defendants failed to disclose the methods that would be necessary to rectify the problem, particularly the fact that B & L would buy back unsold merchandise from its distributors, which would further decrease B & L's revenues.

Plaintiffs allege that defendants knew the truth about these matters by virtue of their involvement with and responsibility for B & L sales and finances. The complaint alleges that defendants received accurate information concerning sales figures and the inventory imbalance from B & L's distributors, who downloaded the figures into B & L's computer system each week. The complaint also alleges that defendants received similar information from B & L representatives who were required to give sales reports to their superiors at B & L.

█ It is true that the complaint does not point to any specific documents that defendants saw, nor does it state precisely when or how each individual defendant became aware that B & L's statements to the public were false or misleading. As stated, however, Rule 9(b) does not require the pleading of detailed evidentiary matter. Since many of these facts lie particularly within defendants' knowledge, plaintiffs cannot reasonably be expected to be able to state at this stage exactly when and how defendants learned that B & L's sales figures were being overstated. "Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs." *Craftmatic Securities Litigation v. Kraftsow,* 890 F.2d 628, 645 (3d Cir.1989). Therefore, "the particularity requirement of Rule 9(b) is appropriately relaxed where the individual defendant is a corporate insider." *Sunrise Industrial Joint Venture v. Ditric Optics, Inc.,* 873 F.Supp.

765, 772 (E.D.N.Y.1995); *see, e.g., Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986).

As the Court of Appeals for the Sixth Circuit stated in *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 681 (6th Cir. 1988):

> We will not demand clairvoyance from pleaders. Corporate entities who jealously guard the names of their clients, or other information, as they should, would be forever victorious in their motions to dismiss under Rule 9(b) if courts demanded the level of specificity at issue in this stage of a case. We are reluctant to punish the plaintiffs for their ignorance of a specific factual detail, as long as defendants have adequate notice of why they are being sued and are capable of preparing a responsive pleading.

*See also Sterling Interiors Group, Inc. v. Haworth, Inc.,* No. 94 CIV. 9216, 1996 WL 426379 *7 (S.D.N.Y. July 30, 1996) (details of alleged price-fixing scheme need not have been pleaded with particularity where "it would take a most impressive feat of clairvoyance" for plaintiff to know those details, which were particularly within defendants' knowledge); *Ivers v. Keene Corp.,* 780 F.Supp. 185, 190 (S.D.N.Y.1991) (where information regarding alleged fraud related essentially to internal workings of corporate defendant, "a rigid application of Rule 9(b) would be particularly inappropriate"); *Nationwide Cellular Service, Inc. v. American Mobile Communications, Inc.,* No. 90 Civ. 6493, 1991 WL 233284 *7 (S.D.N.Y. Oct. 29, 1991) (allegations predicated on information and belief were acceptable, since they related either to matters peculiarly within defendants' knowledge, or related to defendants' scienter, which is not subject to the "more exacting" particularity requirements of other components of fraud allegations) (citing *Ouaknine,* 897 F.2d at 81).

The cases relied upon by defendants (primarily *San Leandro* and the cases cited therein) in support of their argument that plaintiffs' allegations do not meet the requirements of Rule 9(b) do not suggest that the complaint in the instant case is inadequate. Although the Second Circuit held in *San Leandro,* 75 F.3d at 812, that the

"[p]laintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales [wa]s insufficient to survive a motion to dismiss," plaintiffs in the case at bar have made more than an "unsupported general claim" that accurate sales figures existed within B & L. The complaint specifically alleges that B & L's distributors made weekly sales and inventory reports to B & L's computer system and that particular, named B & L representatives provided defendant Gill with contemporaneous sales reports. In addition, the defendants in *San Leandro* denied that anything the company said was actually false at the time the allegedly fraudulent statements were made. In the instant case, however, defendants admit that some of B & L's published sales figures and projections were in fact inaccurate; they simply maintain that they did not realize that at the time, and that they had been deceived by lower-level employees.

Defendants also point out that *In re Healthcare Compare Corp. Securities Litigation,* Fed.Sec.L.Rep. (CCH) ¶ 98,633, 1995 WL 64900 (N.D.Ill. Feb. 13, 1995), cited by plaintiffs, was recently reversed by the Seventh Circuit. *In re HealthCare Compare Corp. Securities Litigation,* 75 F.3d 276 (7th Cir.1996). In *Healthcare,* the district court held that an allegation that the defendant corporation "had access to extensive databases to determine the status of new client figures" supported the plaintiffs' claim that the defendant should have informed the public sooner that its fiscal projections for the current year were too high. However, the plaintiffs in *Healthcare* simply alleged that the defendant *could* have used its databases to determine accurate figures, not that the officers who made the allegedly misleading statements had been provided the actual figures. The plaintiffs alleged that: "internal information was available within HealthCare which *if utilized* would have revealed" that its financial predictions were too high; 1995 WL 64900 *4 (emphasis added); that the defendant's database gave it *"the ability* to calculate yearly fees quickly upon being ad-

vised of enrollment levels," and that it "was *able* to process enrollment data and translate it into certain financial forecasts . . ." 75 F.3d 276 (emphasis added). The Seventh Circuit held that these allegations "d[id] little to show what the company knew in early February," when it made its earnings forecasts, since plaintiffs did not "allege how the database was used in 1993, what information was processed, or any other specifics regarding use of the database prior to February 2 and 9." *Id.* at 277.

In contrast, plaintiffs in the case at bar have not merely alleged that defendants had the *ability* to determine B & L's true sales figures. They allege that they *did* receive accurate reports from B & L's distributors and representatives. It is true that the complaint states that defendants "knew or had access to information" on B & L distributors' actual sales figures and that defendants "were able to receive such information" over B & L's computer system. The complaint does not state that on a particular date a particular defendant reviewed a particular piece of information. Such facts, however, obviously lie peculiarly within defendants' knowledge, and it would be virtually impossible for plaintiffs to make such an allegation. Furthermore, even if defendants did not review this type of information, their failure to do so, combined with other evidence concerning their role in B & L's sales programs that caused the inventory imbalance, and their knowledge of or participation in B & L's public statements about its performance, could conceivably support a finding of recklessness. In short, these allegations, which must be accepted as true at this juncture, are sufficient to meet the requirements of Rule 9(b).[2]

## II. Forward–Looking Material Misstatements

Defendants also contend that the allegedly fraudulent statements were nothing more than general expressions of optimism about B & L's future prospects, which cannot rise to the level of material misstatements

---

**2.** My finding that the complaint sufficiently alleges conscious or reckless behavior by defendants makes it unnecessary to consider whether it also adequately alleges motive and opportunity to commit fraud.

for purposes of a securities fraud claim. Defendants maintain that the statements simply indicated that B & L expected or was hopeful for continued financial health, not that it was guaranteeing good results.

Defendants further assert that B & L's statements in 1993 were of the type that "bespeak caution," *i.e.*, that they simply "reflect[ed] hope, adequately tinged with caution," *San Leandro*, 75 F.3d at 811, and therefore could not have been fraudulent. Defendants note that several times before the June 3, 1994 announcement, B & L warned investors about potential problems in 1994, such as weak consumer demand in certain markets.

As the previous discussion of the scienter allegations makes clear, however, plaintiffs have not alleged only forward-looking statements by defendants; they have also alleged that defendants misrepresented actual facts, including: B & L's past performance, particularly its sales and earnings figures; the magnitude of, and the reasons for, the inventory imbalance; the methods by which inventory was to be reduced; and the level of consumer demand for B & L products. *See* Complaint ¶¶ 54–58, 65, 69–76, 85, 88, 89, 93, 100, 101, 108, 110, 113. These allegedly false statements of present and past events in turn formed the basis for defendants' sanguine predictions about future growth and earnings. In my view, these statements were sufficiently concrete and factual in nature that they could form the basis for a fraud claim. The fact that some of B & L's statements also related to future expectations, or that they noted concerns about certain matters, does not alter the fact that plaintiffs allege that defendants knowingly made particular factual representations that they knew to be false.

### III. Statute of Limitations

#### A. Class I Claims Against the Additional Individual Defendants

■ The additional individual defendants contend that the claims against them relating to the Class I period are time-barred. I agree.

The additional individual defendants were first sued in connection with the events in question in the *Grossman* case, which was commenced on January 31, 1995. The complaint in *Grossman*, however, only asserted claims on behalf of a putative class of plaintiffs who had purchased B & L stock during the Class II period, between June 4, 1994 and January 25, 1995.

The second amended complaint in this action, which was filed on September 21, 1995, incorporated both the Class I and Class II periods. These claims were asserted against all defendants.

Thus, the Class I claims were not brought against the additional individual defendants until September 1995. The additional individual defendants contend that these claims are untimely as to them because they were brought more than one year after plaintiffs discovered the alleged 10(b) violation. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 2782–83, 115 L.Ed.2d 321 (1991) (§ 10(b) claim must be brought within one year of discovery of alleged violation, and no later than three years after alleged violation occurred).

Plaintiffs do not dispute that these claims were brought more than one year after discovery of the alleged fraud; indeed, they hardly could make such an argument, since the Class I claims themselves were initially brought against B & L and Gill in June 1994. Instead, plaintiffs contend that these claims relate back to the filing of the *Grossman* complaint under Rule 15(c)(2) of the Federal Rules of Civil Procedure. In the alternative, plaintiffs contend that these claims relate back to the filing of the original complaint in June 1994 pursuant to Rule 15(c)(3). I find neither of these assertions persuasive.

First, I believe that relation back here cannot be premised solely on Rule 15(c)(2), without reference to Rule 15(c)(3). Rule 15(c) clearly makes amendments changing or adding a party subject to subdivision (3). Whereas Rule 15(c)(2) discusses the relation back of claims or defenses in general, Rule 15(c)(3) expressly sets out certain additional requirements when an amendment would

"change[ ] the party or the naming of the party against whom a claim is asserted ..."

"While the Rule as phrased deals only with changing defendants, courts have applied it to amendments substituting or adding plaintiffs." 3 James W. Moore, Moore's Federal Practice ¶ 15.15[4] at 15–170 (2d ed. 1996). *See, e.g., Nelson v. County of Allegheny,* 60 F.3d 1010, 1014 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1266, 134 L.Ed.2d 213 (1996); *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* No. 92 CIV. 6879, 1994 WL 324018 (S.D.N.Y. June 6, 1994); *Morin v. Trupin,* 778 F.Supp. 711, 734 (S.D.N.Y.1991). The Advisory Committee Notes to the 1966 amendment of the rule also point out that "the attitude taken in Revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs."

In the case at bar, the assertion of Class I claims against the additional individual defendants can be viewed as both adding new defendants and new plaintiffs. With respect to the original Class I action against Gill and B & L, the additional individual defendants have been added. With respect to the *Grossman* action, the third amended complaint in the instant case adds new plaintiffs—the Class I plaintiffs. Whereas the claims asserted in *Grossman* were brought on behalf of plaintiffs who had purchased B & L stock between June 4, 1994 and January 25, 1995, the claims asserted against the additional individual defendants in the present complaint are brought on behalf of persons who purchased B & L stock between October 13, 1993 and June 3, 1994.

In determining whether new claims relate back to an earlier pleading, courts generally "inquire whether the defendants (A) received such notice that they will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought with the original claims." *Nelson,* 60 F.3d at 1014 (footnote omitted); *Kahn v. Chase Manhattan Bank, N.A.,* 90 Civ. 2824, 1995 WL 491067 *3 (S.D.N.Y. Aug. 17, 1995) ("the court must focus on the notice to the defendant of the additional claims within the

limitations period, and the existence of mistake in the original pleading"), *appeal dismissed,* 91 F.3d 385 (2d Cir.1996); *Morin,* 778 F.Supp. at 735 (same).

In the case at bar, it is questionable at best whether the Class I plaintiffs' claims against the additional individual defendants meet the notice requirement. In *Grossman,* the additional individual defendants were alleged to have committed fraud only within the Class II period, and the fact that Gill and B & L itself were named in a lawsuit by plaintiffs who purchased B & L stock during the Class I period gave the additional individual defendants little reason to think that they would be subjected to claims by those plaintiffs too. *See Morin,* 778 F.Supp. at 735 (original, timely complaint in securities fraud case did not satisfy notice prong as to new plaintiffs "since it contained no like intimation of a greater universe of possible plaintiffs").

Likewise, the fact that defendants' alleged actions during the Class I period are similar to their actions during the Class II period does not mean that they should have known that they would be sued by the Class I Plaintiffs. "The spirit and the letter of statutes of limitations require the Court to recognize a defendant's interest in foreclosing claims by additional plaintiffs arising out of identical but separate acts.... To hold otherwise would require the Court to hold that every party who has knowingly given rise to a cause of action has notice that he will be sued." *Kahn,* 1995 WL 491067 *3.

Even if plaintiffs could show notice, however, they cannot meet the second prong of the test: the existence of a mistake concerning the identity of the proper party. There is no showing either that the Class I plaintiffs were omitted from the *Grossman* complaint because of a mistake, or that the additional individual defendants were not timely named in the original complaint in this action due to a mistake. *See Nelson,* 60 F.3d at 1014 (new plaintiffs' argument that claims related back to original complaint failed because they did not demonstrate mistake concerning identity of proper party); *Morin,* 778 F.Supp. at 734 (new plaintiffs' claims did not relate back, since there was no suggestion that new plain-

tiffs were omitted as proper plaintiffs in the original complaint by mistake).

The fact that the Class I plaintiffs may initially have been ignorant of the additional individual defendants' participation in the alleged scheme to defraud also fails to justify relation back of their claims. There is no claim that plaintiffs were unaware of the additional individual defendants' existence or identity, and to allow relation back simply because the Class I plaintiffs did not learn of these defendants' alleged violations until after the limitations period expired would be "an unprecedented and unwarranted extension of Rule 15(c)." *In re Rexplore, Inc. Securities Litigation,* 685 F.Supp. 1132, 1145 (N.D.Cal.1988). The limitations period as set forth by the Supreme Court in *Lampf* "would be rendered meaningless" if a plaintiff could "effectively benefit from the equitable tolling doctrine by piggybacking his action which, if tried separately, would be clearly barred, on a timely one through consolidation." *Morin,* 778 F.Supp. at 734 (statute of limitations barred securities fraud claims brought more than three years after alleged violation, even though plaintiffs' cases had been consolidated with timely lawsuit).

■ In addition to these considerations, I find that plaintiffs have not shown an identity of interests between the Class I and Class II plaintiffs, which some courts have held is a factor in determining whether to allow an amendment adding new plaintiffs. *See, e.g., In re Syntex Corp. Securities Litigation,* 855 F.Supp. 1086, 1098 (N.D.Cal.1994). Because the plaintiffs in the two classes bought, and perhaps sold, B & L stock at different times and at different prices, their interests may in fact conflict. The reason for this arises from the events defining the two class periods. The Class I period includes persons who bought B & L stock prior to B & L's announcement on June 3, 1994. From that

date until the end of the Class II period in January 1995, the price of B & L stock generally declined, as B & L made successive negative disclosures. According to the Class II plaintiffs, however, B & L's fraud continued during the Class II period; they allege that although B & L did release some negative information during the Class II period, it continued to minimize the magnitude of its problems and to conceal certain facts from the public. Therefore, a plaintiff who purchased B & L stock during the Class I period but sold it during the Class II period, though he may have sold it at a loss, nevertheless would have benefited to some extent by B & L's alleged fraud during the Class II period. In that situation, it would be in the interest of the Class I plaintiff to minimize the degree to which the stock's price was artificially inflated on the date of sale; the Class II plaintiff would have precisely the opposite interest.[3]

### B. Extension of Class I Period Backward to October 13, 1993

■ The third amended complaint purports to extend the Class I period backward to include claims on behalf of persons who bought B & L stock between October 13, 1993 and January 25, 1995. The class periods in the second amended complaint ran from December 14, 1993 to January 25, 1995. Defendants contend that this attempt to extend the class period backwards is barred by the one-year-after-notice statute of limitations. Defendants maintain that the prior pleadings establish that plaintiffs knew of defendants' allegedly fraudulent actions during the October-to-December time period more than one year before service of the third amended complaint.

The basis for this expansion of the class period is a press release issued by B & L on

---

3. For an extensive discussion of the seller/buyer conflict, *see In re Seagate Technology II Securities Litigation,* 843 F.Supp. 1341, 1359–62 (N.D.Cal. 1994). Although *Seagate*'s view that this conflict may make class certification improper has been rejected by some courts, *see, e.g., In re Proxima Corp. Securities Litigation,* No. 93–1139–IEG, 1994 WL 374306 *19 (S.D.Cal. May 3, 1994), even courts that have found that the conflict does not stand in the way of class certification have

nonetheless recognized that it may exist; *see, e.g., Blackie v. Barrack,* 524 F.2d 891, 908–11 (9th Cir.1975); *Koenig v. Smith,* 88 F.R.D. 604, 609 (E.D.N.Y.1980). Regardless of whether *Seagate*'s holding with respect to the propriety of class certification is sound, then, the fact remains that for purposes of relation-back analysis, the two classes here do not have an identity of interests.

October 13, 1993. Plaintiffs allege that this press release falsely stated that B & L was taking certain measures to streamline its manufacturing operations, such as reducing its workforce and consolidating some plants, in order to better utilize its facilities and lower its costs, whereas in fact these measures were a response to a severe decline in demand for B & L's products. The complaint also alleges that the press release reported that B & L's third-quarter revenues had increased eight percent over the same period for the prior year, to $498.8 million, although the complaint does not expressly allege that this statement was false.

Plaintiffs do not claim that they were unaware of the existence of this press release at the time the original complaint was filed. As with the Class I claims against the additional individual defendants, plaintiffs contend that the claims on behalf of purchasers of B & L stock between October 13 and December 13, 1993 relate back to the filing of the original complaint.

I find that these claims do not relate back under Rule 15, and that they are time-barred. For one thing, these claims do not meet the prerequisites of Rule 15(c)(3) concerning the addition of new plaintiffs. Nothing in the prior pleadings put defendants on notice that they would be subject to claims by persons who had bought B & L stock before December 14, 1993. There is also no mistake here concerning the identity of the proper parties that would justify the failure to assert these claims sooner.

In addition, these claims do not meet Rule 15(c)(2)'s requirement that "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading ..." The October 13 press release was not mentioned in the prior pleadings and constitutes a separate alleged act of fraud. *See Hunt v. American Bank & Trust Co. of Baton Rouge*, 783 F.2d 1011, 1014 (11th Cir.1986) (claims based on two allegedly fraudulent transactions did not relate back to original complaint, which alleged a separate transaction); *In re Crazy Eddie Securities Litigation*, 747 F.Supp. 850, 855 (E.D.N.Y.1990) (claims in amended complaint relating to stock sales in December 1985 and March 1986 did not relate back to original complaint, which alleged material misstatements in connection with sale in March 1985); *In re Commonwealth Oil/Tesoro Petroleum Corp. Securities Litigation*, 467 F.Supp. 227, 260 (W.D.Tex.1979) (amended complaint did not relate back to original complaint, since it "allege[d] new events not even mentioned in the original complaint"); *cf. Wells v. HBO & Co.*, 813 F.Supp. 1561, 1565–66 (N.D.Ga.1992) (amended complaint related back to original, since amended complaint attacked the same statements in the same SEC filings as the original complaint, but simply stated another reason that those statements falsely inflated the value of defendant's stock; noting that "[w]hether the amended complaint would arise out of fraudulent acts occurring at the same time as the fraudulent acts in the original complaint is at least one factor to consider"); *Issen v. GSC Enterprises, Inc.*, 538 F.Supp. 745, 749 n. 5 (N.D.Ill.1982) (claims on behalf of persons who purchased stock in 1969 related back to original complaint, which identified class as composed of persons who bought stock after January 1, 1970, since "the claims of 1969 purchasers arose out of precisely the same transactions and occurrences alleged in [the] original complaint").

In determining whether a claim in an amended pleading arose out of the same conduct, transaction or occurrence alleged in an earlier pleading, courts have focused on whether the prior pleading put the other party on notice of the acts giving rise to the claim. *See, e.g., Strong & Fisher Ltd. v. Maxima Leather, Inc.*, No. 91 CIV 1779, 1995 WL 293607 *4 (S.D.N.Y., May 11, 1995); *Contemporary Mission, Inc. v. New York Times Co.*, 665 F.Supp. 248, 255 (S.D.N.Y. 1987), *aff'd*, 842 F.2d 612 (2d Cir.), *cert. denied*, 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988). Although the prior pleadings did put defendants on notice that plaintiffs' claims against them arose out of the same general scheme to defraud as that alleged in the current complaint, those pleadings gave no indication that plaintiffs were alleging any fraudulent conduct by defendants prior to December 14, 1993.

· It should also be noted that the third amended complaint alleges that the October 13 press release

> announced, *inter alia*, that B & L was instituting a series of actions directed at streamlining its manufacturing operations supporting its sunglass and ophthalmic pharmaceutical business to improve the operating performance of both product areas. Specifically, the Company announced in that release that it was reducing its worldwide work force by more than 500 employees, and consolidating some of its manufacturing plants.

Third Amended Complaint ¶ 55. The complaint also alleges that Gill was quoted in the press release as stating that these measures would "improve Bausch & Lomb's earnings potential in 1994 and beyond ...," that he expected B & L to "report very solid progress ...," etc. Third Amended Complaint ¶ 56.

The prior complaints made virtually identical allegations about B & L's December 14, 1993 press release. *See* First Amended Complaint ¶¶ 39, 40; Second Amended Complaint ¶¶ 45, 46. The third amended complaint does not make these allegations about · the December 14 press release. Thus, it appears that the statements formerly alleged to have been made on December 14, 1993 are now alleged to have been made on October 13, 1993.

Arguably, then, the previous allegations concerning the December 14 press release could be said. to have put defendants on notice that the same statements that were contained in the October 13 press release might be a basis for plaintiffs' claims, except for one problem: the statements were not contained in the October 13 press release. An examination of the press releases shows that the statements about streamlining manufacturing operations, and the previously quoted statements by Gill, were contained only in the December 14 press release. *See* Lurie Affidavit Exs. 3, 4. Clearly, then, there was no reason for defendants to anticipate that they would be alleged to have made these statements on October 13, 1993.

## IV. Control–Person Liability

 The individual defendants contend that the claims against them based upon § 20(a) of the Act, 15 U.S.C. § 78t(a), must be dismissed because plaintiffs have not pleaded facts from which it can be inferred that the individual defendants both had the power to control or influence B & L or its management, and that they were culpable participants in the primary violation and had knowledge of the violation. Plaintiffs assert that they have pleaded sufficient facts to establish control person liability, and they further maintain that it is not necessary to allege culpable conduct by the individual defendants at this stage.

A threshold question, then, concerns the pleading requirements for a § 20(a) claim. As another district court within this circuit recently noted, whether a plaintiff must allege the defendant's scienter or culpable conduct for a 20(a) claim continues to be "a subject of controversy in this Circuit." *Duncan v. Pencer,* No. 94 Civ. 0321, 1996 WL 19043 *15 (S.D.N.Y. Jan. 18, 1996). Some district courts have held that a plaintiff bringing a § 20(a) claim must allege both control and either scienter or culpable conduct, while others have held that § 20(a) requires the plaintiff to allege only control, not scienter or culpable conduct, with the burden then shifting to the defendant to show good faith as an affirmative defense. *See id.* at *17 and cases cited therein.

 After considering the matter, I find the reasoning of the latter cases more persuasive. The Second Circuit held in *Marbury Mgmt., Inc. v. Kohn,* 629 F.2d 705, 716 (2d Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), that once a plaintiff establishes a defendant's control status, the defendant must shoulder the burden of proving his good faith. Both this holding and the wording of the statute itself suggest that good faith is an affirmative defense. As such, the good-faith defense should not be determined on a motion to dismiss, but rather after full discovery and, if necessary, a hearing. *See Duncan,* 1996 WL 19043 *17–18; *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.,* 735 F.Supp. 587, 590 (S.D.N.Y.1990); *Zimmerman v. Prime Med-*

*ical Services, Inc.,* 729 F.Supp. 23, 25 (S.D.N.Y.1990); *Mauriber v. Shearson/American Express, Inc.,* 567 F.Supp. 1231, 1238 (S.D.N.Y.1983).

■ Plaintiffs, therefore, make out a prima facie case of control person liability if they sufficiently allege the individual defendants' control status. By doing so, plaintiffs raise a presumption of actual control, rebuttable either by a showing of good faith, or the absence of actual control. *See Savino v. E.F. Hutton & Co.,* 507 F.Supp. 1225, 1243 (S.D.N.Y.1981).

■ The burden of showing control status is not particularly onerous. The SEC defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b–2.[4] In determining control status, "courts have given heavy consideration to the power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof." *Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 890 (3d Cir.1975), *cert. denied,* 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976). In other words, control requires "'only some indirect means of discipline or influence short of actual direction.'" *Drobbin v. Nicolet Instrument Corp.,* 631 F.Supp. 860, 864 (S.D.N.Y.1986) (quoting *Myzel v. Fields,* 386 F.2d 718, 738 (8th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968)); *see also Savino,* 507 F.Supp. at 1243.

■ In order to survive a motion to dismiss at the pleading stage, then, a plaintiff must plead facts which "support a reasonable inference that they had the potential power to influence and direct the activities of the primary violator." *Food and Allied Service Trades Dep't, AFL–CIO v. Millfeld Trading Co.,* 841 F.Supp. 1386, 1391 (S.D.N.Y.1994); *Borden,* 735 F.Supp. at 591. I find that plaintiffs have met this standard. For one thing, the complaint alleges that all the individual defendants but Stephenson and McCluski owned significant amounts of B &

L stock during the relevant time period. Stephenson and McCluski, however, are alleged to have had particular responsibility with respect to B & L's finances. In that regard, all of the individual defendants are alleged to have been high-ranking officers within B & L, with responsibility either for B & L's overall performance, or for its finances: Gill, Chairman, Chief Executive Officer, and Chief Spokesperson; Zarella, President and Chief Operating Officer; Stephenson, Senior Vice President–Finance; Resnick, Vice–President and Treasurer; and McCluski, Controller.

■ It is true that mere status or position in a company does not conclusively show control status. *See Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1441 (9th Cir. 1987). Nevertheless, in all cases, "'[t]he issue of "control" is a complex fact question, which requires close examination of the relationships of the various alleged "controlling persons" to the person or entity which [is] alleged to have violated the Act.'" *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.,* 458 F.Supp. 1110, 1126 (S.D.N.Y. 1978) (quoting *First Nat'l Bank of Orlando v. Miller,* 77 F.R.D. 430, 439 (S.D.N.Y.1978)), *rev'd on other grounds,* 602 F.2d 478 (2d Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980). The nature of the individual defendants to B & L and to the alleged fraud here suggests that they had control status. Furthermore, the complex factual issues relating to this issue cannot be resolved on a motion to dismiss.

## CONCLUSION

Defendant Bausch & Lomb, Inc.'s motion to dismiss the complaint (Item 41), and the individual defendants' motion to dismiss the complaint (Item 39), are granted in part. Plaintiffs may not assert claims against any defendants arising out of purchases of Bausch and Lomb stock prior to December 14, 1993, and plaintiffs may not assert claims against Ronald L. Zarella, Peter Stephenson, Alan H. Resnick, or Stephen L. McCluski arising out of purchases of Bausch and Lomb stock between December 14, 1993 and June

---

**4.** For purposes of the Act, the term "person" includes a company. 15 U.S.C. § 78c(a)(9).

3, 1994. In all other respects, defendants' motions to dismiss are denied.

IT IS SO ORDERED.