In re **COMPUTER ASSOCIATES CLASS ACTION SECURITIES LITIGATION.**

**No. 98–CV–4839(TCP).**

United States District Court,
E.D. New York.

Nov. 15, 1999.

Steven G. Schulman, Robert P. Sugarman, Milberg, Weiss, Bershad, Hynes & Lerach LLP, Jules Brody, Stull Stull & Brody, New York City, for Andrew L. Barroway, Steven Sinsheimer, Felix Glaubach, Jerry Wehmhoefer, Mishel S. Tehrani, John J. Greco and Lillian Herschkowitz.

Caroline S. Press, David E. Nachman, Solomon, Zauderer, Ellenhorn, Frischer & Sharp, New York City, for Computer Associates Intern., Inc., Charles B. Wang and Sanjay Kumar.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Defendants have moved to dismiss plaintiffs' Consolidated Amended Class action Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

## BACKGROUND

### A. Parties

Lead plaintiffs Steven Sinsheimer, John Greco, Felix Glaubach, Mishel Tehrani, Jerry Wehmhoefer, Lillian Herschkowitz, Bruce Montague, Kerry Gillispie, John Biegen, Jixiang Wu, Richard Wadsworth, and Andrew Breiman all purchased stock in Computer Associates International, Inc. or transacted in such stock options from January 20, 1998, through July 22, 1998, the relevant period in this action.[1] Likewise, plaintiffs' putative class consists of over two-hundred individuals who purchased CA stock during the Class Period.

Defendant Computer Associates International, Inc. ("CA") is a Delaware corporation with its principal executive offices in Islandia, New York. CA is in the business of developing, marketing, licensing, and supporting standardized computer software for use in a broad range of computers on a variety of hardware platforms, operating systems, and application development environments. (Am.Compl.¶ 12, 42.) CA's shares are traded on the New York Stock Exchange ("NYSE").

At all times relevant to this action, defendant Charles Wang was CA's Chief Executive Officer and Chairman of its Board of Directors. Defendant Sanjay Kumar was CA's President and Chief Operating Officer, as well as a member of the company's Board of Directors. Defendant Artzt, as CA's Executive Vice President of Research and Development and Senior Development Officer, also served on the company's Board of Directors. As officers and directors of CA, defendants Wang, Kumar,

1. On October 9, 1998, this Court appointed these individuals Lead Plaintiffs.

and Artzt (collectively, the "individual defendants") participated in the drafting, preparation, and/or approval of the various financial reports, press releases, internal shareholder communications, and Securities Exchange Commission ("SEC") filings at issue in this action. (Am.Compl.¶ 19.)

## B. Plaintiffs' Class Action Allegations

Plaintiffs commenced this action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class, consisting of all persons who purchased CA common stock from January 20, 1998, thought July 22, 1998. Excluded from the Class are the individual defendants, CA's officers and directors, and members of their families. Plaintiffs allege that this Class satisfies each of the requirements of Rule 23(a), namely, that (1) the Class is so numerous that joinder is impractical; (2) the Class members share common issues of law and fact; (3) the claims and defenses of the Class representatives are typical of those belonging to the class as a whole; and (4) the Class representatives will adequately protect the interests of the entire class. This Court has yet to certify the putative class.

## C. Plaintiffs' Substantive Allegations

In 1995, CA adopted the Key Employee Stock Ownership Plan (the "1995 Plan"), the purpose of which was "to promote the creation of stockholder value by encouraging, recognizing and rewarding sustained outstanding individual performance by certain key employees who are largely responsible for the management, growth and protection of the business." (Defs.' Ex. B at 14.) Under the 1995 Plan, "three key executives," namely defendants Wang, Kumar, and Artzt, would receive approximately $1 billion in CA Common and Restricted Stock as long as the price for CA's Common Stock exceeded $53.33 (as adjusted after stock splits) for 60 days during any 12–month period by the end of the company's fiscal year 2000. (Defs.' Ex. B at 15.) Plaintiffs contend that as of January 1, 1998, CA stock traded above the threshold level for a mere 6 days since

October 1, 1997, the date that CA stock first traded above the vesting price. (Am. Compl.¶ 43.)

According to plaintiffs, immediately prior to and throughout the Class period CA began to experience financial problems, stemming from, *inter alia:* (1) the reluctance on the part of CA's largest customers to commit significant financial resources to CA's costly products in light of the Y2K problem and the Asian financial crisis; (2) the increased saturation in CA's markets, causing a decline in the demand for CA's technology; and (3) CA's inability to diversify its business by providing installation and maintenance services. (Am. Compl. ¶ 46.)

In an attempt to remedy the latter problem, CA sought to acquire Computer Sciences Corporation ("CSC"), which was in the business of implementing, servicing, and maintaining the kind of software produced by CA. Accordingly, on or about February 17, 1998, CA announced a cash-for-stock tender offer for all outstanding stock of CSC at $108 per share. (Am. Compl.¶ 44.) In response, CSC mounted a defense to CA's takeover efforts, which led to a sharp decline in the price of CA's stock—from the mid to high $50s to the mid to high $40s—well below the price necessary for the stock grants provided to the individual defendants under the 1995 Plan to vest. (Am.Compl.¶ 44.)

Plaintiffs claim that in order to restore the sagging value of CA stock, and therefore protect the stock interests of the individual defendants as provided under the 1995 Plan, CA began taking steps to artificially inflate its reported revenues and thereby conceal the deteriorating state of CA's business. (Am.Compl.¶ 47.) Although general accounting procedures "provide that revenues should not be recognized until they are realizable, earned and the collection of the sales price is reasonably assured," CA allegedly recognized revenue from the sale of software on credit terms extending as long as 10 years. (Am.Compl.¶¶ 82, 86.) CA also offered

customers excessive discounts, placed an unusual amount of pressure on its sales force to "book" sales, and engaged in "improper revenue recognition practices that artificially inflated" CA's operating results. (Am.Compl.¶ 47.) According to plaintiffs, each of these practices front loaded sales both before and during the class period at the expense of future periods, thereby hiding CA's poor earnings prospects while at the same time safeguarding the individual defendants' interests under the 1995 Plan.

At the same time, CA allegedly made numerous false and misleading statements during the Class period, portraying itself publicly as a "booming company which was experiencing and would continue to experience rapidly rising sales and profits on its core products and new product offerings, and as a company whose order pipeline was 'strong.'" (Am.Compl.¶ 45.) According to plaintiffs, each of these false statements was either prepared, made, or released by one or more of the individual defendants. (Am.Compl.¶¶ 51, 56–57, 63, 67, 69.) In issuing such statements, CA and the individual defendants allegedly failed to reveal adverse financial information, the disclosure of which "was necessary to make the statements not false and misleading." (Am.Compl.¶ 49.)

For example, on four separate occasions during the relevant period, CA issued press releases published on *Business Wire* in which they boasted record financial results and a strong worldwide demand for CA's products. (Am.Compl.51, 55, 57, 63.) On January 20, 1998, April 22, 1998, and May 19, 1998, CA reported large increases in its revenues and earnings results for the third an fourth quarters respectively of fiscal year 1998. (Am.Compl.¶¶ 51, 57, 63.) Plaintiffs maintain that each of these statements was rendered false and misleading because of CA's failure to disclose that its revenue figures were, in fact, artificially inflated. (Am.Compl.¶¶ 52, 58, 64.) Similarly, on March 5, 1998, CA announced that it would allow its tender offer for CSC expire without disclosing the primary reason for its abandonment thereof, namely, CSC's active opposition to such offer. (Am.Compl.¶ 55.)

Following each of these press releases, the information contained therein was incorporated into reports issued by analysts from various brokerage houses, including Prudential, Bear Stearns, Furman Selz, and AAI, characterizing CA's earnings as "strong," and giving the stock a "BUY" rating. (Am.Compl.60, 67). Plaintiffs emphasize that the analysts' reports "and the estimates and recommendations contained therein, were based upon direct communications with defendants Wang, Kumar and/or Artzt, and were of a nature that could only have been provided (or based on specific information provided) by the Company and its senior management." (Am. Compl.¶ 68.)

Plaintiffs claim that as a direct result of these misstatements and omissions, on May 22, 1998, the price per share of CA stock rose above the threshold level of $53.33 for the sixtieth day within the previous 12 months. This, in turn, caused the stock to which the individual defendants' were entitled under the 1995 Plan to vest, allowing defendants Wang, Kumar, and Artzt to collect a combined $1.15 billion worth of CA stock. (Am.Compl.¶ 70.)

Plaintiffs assert that a mere eight weeks later, a very different picture of CA's financial status began to emerge. On July 21, 1999, CA issued a press release in which defendant Kumar stated that although CA had again reported increased revenues for the first quarter of fiscal 1999, it anticipated that growth over the next several quarters would be slow in light of the Asian financial crisis and Y2K problem affecting several of CA's clients. (Am.Compl.¶ 72.) CA's management also revealed that it had reduced its estimates of CA's future revenue by $100 million for the quarters ending September 30th and December 1, 1998. (Am.Compl.¶ 74.)

On July 22, 1999, the market price of CA's shares dropped to $17.5 per share, at which point market analysts quickly reduced their ratings and estimates for CA

stock. (Am.Compl.¶¶ 74, 75.) Plaintiffs allege that CA's reliance on the Asian financial crisis and the Y2K problem as the source of its own financial troubles was mere "windowdressing," designed to conceal the fact that CA's problems stemmed from its efforts to artificially inflate CA's sales prior to and during the Class period. To support this contention, plaintiffs rely on reports from such analysts as Weslet Golby, who essentially accused CA, among others, of "over-inflating their current revenues at the expense of future revenues." (Am.Compl.77.)

On July 23, 1998, plaintiffs commenced this action, asserting two claims under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*: a claim against all defendants under section 10(b), and Rule 10b–5 promulgated thereunder, as well as a claim against the individual defendants under section 20(a). Plaintiffs also contend that CA employed improper revenue recognition practices that caused CA's reported revenue and earnings per share to be materially overstated.

### A. Standard of Review Under Rule 12(b)(6)

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, dismissal is warranted where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 123 (2d Cir.1991) (*quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80, (1957)). The Court must accept the facts alleged in the complaint as true and draw all reasonable inferences from those allegations in favor of plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The complaint, however, must "give defendants fair notice of what the plaintiffs' claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47, 78 S.Ct. 99.

### B. Standard of Review under Rule 9(b) and Section 10(b)

■ When a complaint alleges fraud, Rule 9(b) of the Federal Rules of Civil procedure requires that the circumstances be pled with particularity. *Acito v. IMC-ERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir. 1995). The complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *Id.* However, Rule 9(b) states that "malice, intent, knowledge, and other condition of mind of a person may be averred generally." *Id.* at 52.

■ Under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, a plaintiff must prove that the defendant, in effectuating an allegedly fraudulent sale, acted with scienter. *Press v. Chemical Investment Services Corp.*, 166 F.3d 529, 537 (2d Cir.1999). "The Private Securities Litigation Reform Act of 1995 heightened the requirement for pleading scienter to the level used by the Second Circuit: Plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u–4(b)(2)." *Id.* at 537–538. However, this requirement may be satisfied either: (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Acito*, 47 F.3d at 52.

### DISCUSSION

### A. Section 10(b) Liability is Adequately Pled

■ Plaintiffs adequately plead fraud with the required particularity. They allege a number of statements made by defendants, detailing the who, what, where, when, and how of the fraudulent statements as discussed *supra*, p. 70–72. *See*

*also Am. Complaint,* ¶¶ 49–68. Plaintiffs supply "as much detail of the alleged fraud as can be expected before discovery commences." *In re AnnTaylor Stores Securities Litigation,* 807 F.Supp. 990, 1004 (S.D.N.Y.1992).

Plaintiffs allege, among other things, that CA's Class Period earning announcements and SEC-filed financial statements for the third quarter ending December 31, 1997 and for the quarter and fiscal year ending March 31, 1998 were knowingly and intentionally inflated. Plaintiffs point specifically to the premature recognition of income on Unicenter deals, long-term installment sales, and on customer support fees. Plaintiffs detail how defendants used specific accounting practices in violation of the Generally Accepted Accounting Principles, ("GAAP"), to prematurely recognize revenue. *See* Am. Complaint, ¶¶ 82–90. These allegations render defendants' earning statements and other positive statements as materially false at the time they were made, not merely optimistic statements. *See In re Northern Telecom Ltd. Securities Litigation,* 1994 WL 455534 at 1–2 (S.D.N.Y. Aug. 22, 1994); *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 282 (3d Cir.1992); *In re AnnTaylor,* 807 F.Supp. at 998. Similarly, these alleged statements are also not mere statements of historical performance or protected by the "safe harbor". *See Bausch & Lomb, Inc. Securities Litigation,* 941 F.Supp. 1352, 1363 (W.D.N.Y.1996).

■ Moreover, statements such as ones specifically attributed to defendants Wang and Kumar in CA's own April 22 and May 21 press releases, stating that CA's "business is stronger than ever," that there was "strong worldwide demand" for CA software, that "[CA's] business fundamentals are strong" and that CA was "solidly positioned for growth", were alleged to be false and misleading for failure to disclose materially adverse business trends and accounting practices. Am.Comp. ¶¶ 57, 63. Thus, this statement, as well as the others concerning the supposed health of the company, are all actionable when consid-

ered as a whole and in light of the alleged improper accounting and revenue inflating practices. *See In re Northern Telecom Ltd. Securities Litigation,* 1994 WL 455534 at 5–6; *AnnTaylor,* 807 F.Supp. at 1004–5.

Defendants' citation of *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 804 (2d Cir.1996) is unavailing. *San Leandro* is easily distinguishable, involving whether "a company had a duty to disclose its consideration of an alternative business plan in order to prevent its prior statements from becoming misleading," not allegations of glowing press releases and the like, concerning the state of the company in the face of massive, intentionally inflated earning statements at issue here.

Defendants only assert that CA's class period press releases and financial statements include meaningful cautionary language consisting of the following: (1) that "there can be no assurances that future results will be achieved," and (2) that there were "important factors that could cause actual results to differ materially." These are general boilerplate disclaimers that do not alter that fact that plaintiffs allege that defendants knowingly made particular factual representations that they knew to be false, especially as to level of consumer demand and CA's past performance, revenues, sales, and earnings. *See Bausch & Lomb,* 941 F.Supp. at 1363.

■ Unknown specifics, such as the exact amount the earnings have been overstated, are not fatal in this case. Plaintiffs allege such a widespread fraudulent practice, that if true, would have a huge net effect in error as to the company's overall figures and is the type of information peculiarly within the defendants' control. *See Bausch & Lomb,* 941 F.Supp. at 1361 ("Since many of these facts lie particularly within defendants' knowledge, plaintiffs cannot reasonably be expected to be able to state at this stage exactly when and how defendants learned that B & L's sales figures were being overstated."); *In re*

*Craftmatic Securities Litigation,* 890 F.2d 628, 645 (3d Cir.1989) ("Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs"). Plaintiffs have not simply alleged mere accounting improprieties or mismanagement; rather, plaintiffs describe a pervasive fraudulent scheme, including intentionally violative accounting practices and inflated revenues, which is materially misleading.

### B. Scienter is Adequately Pled

#### i. Motive and Opportunity

■ The plaintiffs have sufficiently alleged the Individual Defendants' motive and opportunity—the receipt of outright stock grants worth over $1 billion if the price of CA's common stock traded at or above the Vesting Price for 60 days in any 12 month period prior to March 2000. *See e.g.* Am. Complaint, ¶ 43. The combination of the timing of this vesting, the subsequent large and unexpected drop in value of the stock, and the mammoth grant incentive, strongly supports Individual Defendants' motive. In addition, plaintiffs have alleged insider trading, which supports an inference of scienter. *See Goldman v. Belden,* 754 F.2d 1059, 1070 (2d Cir.1985).

Plaintiffs also adequately allege opportunity, as defendants Wang, Kumar, and Artzt were the three most senior officers, who participated in the drafting, preparation, and/or approval of the financial reports, press releases, shareholder communications, and SEC filings at issue.

#### ii. Reckless or Conscious Misbehavior

■ The plaintiffs have also adequately alleged facts sufficient to demonstrate reckless or conscious misbehavior. Plaintiffs detail, among other things, defendants' alleged fraudulent scheme involving intentional and knowing improper recognition and inflation of earnings, revenue, and sales. These allegations, in combination with other statements made by Individual

Defendants, and the enormous scope and scale of this alleged fraud, if true, rises to the level of conscious misbehavior or recklessness. *See In re MTC Electronic Technologies Shareholders Litigation,* 898 F.Supp. 974, 989 (E.D.N.Y.1995) *vacated in part,* 993 F.Supp. 160, 162 (E.D.N.Y. 1997). In all, plaintiffs alleged sufficient facts to give rise to a strong inference of fraudulent intent.

### CONCLUSION

For the foregoing reasons, defendants' Motion to Dismiss must be and the same is hereby denied.

SO ORDERED.