Asadour MANAVAZIAN, Terry Giese, Richard Houchin, Steven Leodis, Anita Loeb, Dr. Cayetano Lopez–Cepero, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

ATEC GROUP, INC., Surinder Rametra, Ashok Rametra, Defendants.

No. 99 CV 4993(FB).

United States District Court, E.D. New York.

Aug. 23, 2001.

David R. Buchanan, Christopher A. Seeger, Stephen A. Weiss, Seeger Weiss LLP, New York City, William Federman, Day, Edwards, Federman, Propester & Christensen, P.C., Oklahoma City, OK, Andrew L. Barroway, Andrew L. Barroway, LLP, Bala Cynwyd, PA, Joseph V. Mc Bride, Brian Murray, Rabin & Peckel LLP, New York City, for Plaintiffs.

Jay B. Kasner, Scott D. Musoff, Skadden, Arps, Slate, Meagher & Flom LLP, New York City, Alfred G. Yates, Jr., Law Offices of Alfred G. Yates, Pittsburgh, PA, Leo W. Desmond, The Law Offices of Leo W. Desmond, Palm Beach Gardens, FL, for Defendants.

### MEMORANDUM AND ORDER

BLOCK, District Judge.

Plaintiffs bring this putative class action against defendants ATEC Group, Inc. ("ATEC" or the "Company"), Surinder Rametra and Ashok Rametra (collectively "individual defendants"), asserting violations of §§ 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§ 78j(b), 78t–1, and Rule 10b–5 of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240 .10b–5. Defendants move to dismiss plaintiffs' § 10(b) and Rule 10b–5 claims for failure to meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737 (codified at 15 U.S.C. §§ 77k, 77l, 77z–1, 77z–2, 78a, 78j–1, 78t, 78u, 78u–4, 78u–5), and to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). The motion is denied.

### FACTUAL ALLEGATIONS

The complaint alleges the following: ATEC, a New York corporation with its principal place of business in Hauppauge, "is a system integrator and provider of information technology service products" with operations in "computer manufacturing, Year 2000 remediation, electronic commerce, internet and high speed data transmission, networking, and satellite communications." Compl. ¶ 14. The Company's shares are traded on the NASDAQ Small Cap Market System. *Id.* ¶ 55. From October 12, 1998 through May 19, 1999 (the "Class Period"), plaintiffs Asadour Manavazian, Terry Giese ("Giese"), Richard Houchin, Steven Leodis, Anita Loeb and Cayetano Lopez Cepero, purchased shares of ATEC common stock. Prior to the Class Period, ATEC "reported rapid expansion and several successive quarters of revenue growth and positive earnings." *Id.* ¶ 2. During the Class Period, defendant Surinder Rametra served as ATEC's chairman of the board and chief executive officer; defendant Ashok Rametra served as treasurer, chief financial officer and director from June 1994 until January 1999, at which time he was appointed president and chief operating officer.

Broadly stated, during the Class Period defendants misled investors by failing "to disclose that the Company's core business had materially shrunk" despite their knowledge of that fact, and made "affirmative disclosures paint[ing] a grossly misleading picture of ATEC's current performance and future prospects—suggesting revenue and earnings growth when the contrary was true." *Id.* ¶ 5. These disclosures and omissions "had the effect of materially inflating the price of ATEC common stock over its true value." *Id.*

¶ 6. The individual defendants capitalized on the inflated value of the stock by selling more than $1.5 million in ATEC stock during the Class Period, and "provided false explanations for their sales, or . . . failed to report the sales at all." *Id.*

## I. Disclosures and Omissions

### A. *Business Conditions*

In late 1998, defendants made a series of statements that "were false and misleading when made." Compl. ¶ 28. On October 12, 1998, ATEC announced that it was creating a new corporate structure that would provide ATEC with "the framework for 'organic growth,' while providing a 'blueprint for seamless integration of future acquisitions and hyper-growth situations which should serve to firmly propel ATEC into the new millennium with sound financial and fundamental performance issues readily addressed.'" *Id.* ¶ 24. On November 3, 1998, ATEC announced that its " 'revenues for the fiscal year ended June 30, 1998 increased 86% to $187,156,-878,' " and that " 'the Company is poised for future growth and [occupies a] [ ] strategic position in the technology industry.'" *Id.* ¶ 25. On November 12, 1998, ATEC announced quarterly revenues of $34,820,833 and earnings of $200,814 for the three months ended September 30, 1998, a sixty-three-percent decline in reported earnings from the same period the previous year. "Defendants assured investors that 'management is intent on delivering record increases in revenue and earnings across the board in fiscal 1999.'" *Id.* ¶ 26. On December 10, 1998, "Surinder Rametra announced the inauguration of ATEC's online store stating, '[a]fter a record year of $187 million in revenues, the company is excited about the advent of our Internet Super Store which will be instrumental in expanding the marketability of our products.'" *Id.* ¶ 27. The aim of the store was to " 'enhanc[e] [ATEC's] revenue and earnings growth.'" *Id.*

All of these statements were false and misleading when made because ATEC knew that it "was not poised for 'hyper-growth,' did not hold a strategic position in the technology industry, and was not capable of delivering 'record increases in revenue and earnings' in 1999." *Id.* ¶ 28. Furthermore, defendants' statements regarding "record revenues" for the year ended June 30, 1998 "in disclosures as late as December 1998 . . . in connection with . . . the Company's present performance and future growth were materially misleading." *Id.* Defendants knew at the time the statements were made that as a result of a "paradigm shift" in the "systems integration/VAR market," ATEC could not "obtain computers to resell from manufacturers with whom it then dealt." *Id.* Defendants knew, but did not disclose, that to meet "[p]rior year results, the Company would need to diversify and expand operations beyond those then in existence," and that the cost of such diversification "would have a material negative impact on the Company's reported earnings for the 1999 fiscal year." *Id.*

On January 27, 1999, ATEC announced the creation of "a diversified internet services division called ATEC One" ("ATEC One") to provide "[i]nternet access from dial-up to high bandwidth applications" and "[i]nternet services including virtual web and domain name hosting, web based messaging services, and Internet/Intranet design and integration for large and small E-commerce solutions." *Id.* ¶ 31. Surinder Rametra stated that " 'we believe our potential growth in this endeavor could be huge.'" *Id.* These statements were false and misleading when made because "ATEC One was not designed to, and never did, provide internet services of the magnitude portrayed by the defendants'

disclosures." *Id.* ¶ 32. ATEC One only offered internet access to customers in Albany, New York, through one dial-up number, and offered limited internet services through a pilot program in one location. *Id.*

On February 12, 1999, ATEC announced revenues of $32,797,105 and earnings of $23,474 for the three months ended December 31, 1998, compared with revenues of $36,193,000 and earnings of $579,397 for the same period the previous year, stating that ATEC was "position[ed] ... for dramatic revenue and earnings growth in the future." *Id.* ¶ 34. That same day, Surinder Rametra held a conference call with "investors and members of the brokerage community," including Epifanio Almodovar ("Almodovar") and other representatives of Prime Charter Ltd. ("Prime Charter"), wherein he stated that ATEC was "still on track" to maintain its revenue and growth earnings model and that ATEC's new initiatives would increase revenues and earnings over prior results. *Id.* ¶ 35. These remarks were false and misleading when made because defendants knew that the industry's paradigm shift would require ATEC to make "diversification and expansion efforts" that would have a "material negative impact" on the Company's 1999 reported earnings. *Id.* ¶ 28.

### B. Nexar Technologies Acquisition

On March 9, 1999, ATEC announced the acquisition of certain patents and trademarks from Nexar Technologies, Inc. ("Nexar"), which "solved the problem of computer obsolescence." *Id.* ¶ 37. The announcement stated that the company planned to use this technology "to create a computer manufacturing division ... expected to contribute over $100 million in sales and $3 million in net income in the first full year in operation. Gross margins in this area of operation are expected to

exceed 20%." *Id.* (internal quotation omitted). Surinder Rametra explained in an article appearing in *New York Newsday* that "he hope[d] to boost the stock price by becoming a manufacturer of computers." *Id.* That same day, ATEC's chief financial officer, James Charles, in "a national conference call with investors and analysts," stated that the Nexar technology was being purchased at a cost of about $300,000. *Id.* ¶ 38. This statement was false and misleading when made. On May 13, 1999, the Company revealed that the cost of acquisition was closer to $1 million. *See id.* ¶¶ 38, 42, 44.

### C. Sale of the Company

In January 1999, Surinder Rametra told members of the brokerage community, including Almodovar of Prime Charter, that "ATEC had positioned itself for sale, had actively sought suitors and was pursuing its sale to a larger, well-established acquirer." *Id.* ¶ 30. This information was provided to brokers with the understanding that it would be conveyed to the market, which it was. In February, March and April 1999, defendants reiterated that ATEC would be acquired, and at one point characterized the sale as "a done deal." *Id.* These statements were false and misleading when made because a subsequent merger announcement "bears out that an acquisition ... was never a 'done deal.'" *Id.*

On May 4, 1999, ATEC announced plans to merge with Wareforce.com, "a purported provider of information technology systems, technical services, and e-commerce solutions." *Id.* ¶ 41. ATEC shares "closed down 27% from the May 4, 1999 pre-announcement high of $9.375" because, according to Jonathan Rich, an investment banker at First Colonial Securities Group Inc., " 'Wall Street had actually been anticipating an acquisition of ATEC.' " *Id.*

On May 13, 1999, ATEC reported revenues of $22,839,467 and earnings of $60,596 for the three months ended March 31, 1999, a fifty-percent revenue shortfall from the same period the previous year. *See id.* ¶ 42. "Surinder Rametra asserted that the entire systems integration/reseller market had been subject to a 'sweeping paradigm shift' and that the way computer manufacturers conducted business had dramatically changed-a change, defendants admitted, they were aware of throughout the prior year." *Id.* In response to this shift, Surinder Rametra stated in a press release that because ATEC "invested considerable time, effort and money in implementing a new and comprehensive business plan which provides for mass diversification of operations and focus, results are being realized in higher gross profits." *Id.* ¶ 43. In the same press release, he represented that "we believe that the steps taken to develop new products, to aggressively implement an internal manufacturing initiative, and to significantly expand our points of distribution will result in long term, profitable opportunities for the Company." *Id.*

On May 19, 1999, ATEC "announced the termination of its pending merger with Wareforce.com due to 'certain terms in [the] merger agreement that called for termination of the deal should the companies' share prices fall below certain levels." *Id.* ¶ 45. The following day, ATEC's shares closed at $4.875. *See id.*

ATEC later announced two moves "attempting to reverse the Company's stock slide." *Id.* ¶ 46. On May 26, 1999, ATEC announced "a strategic stock buyback of its common shares," and on May 28, 1999, "ATEC announced the repurchase of 4.5 million options from the former owners of LOGIX, ATEC's Year 2000 remediation division." *Id.* Notwithstanding these announcements, ATEC's stock "continued its steady decline.... ATEC stock closed at $2.6562 on August 23, 1999." *Id.* ¶ 47.

### D. Building Purchase

On December 31, 1998, Surinder Rametra sold 70,000 shares of ATEC common stock, later informing the brokerage community, including Almodovar of Prime Charter, that the sale was to allow him to purchase a building in Manhattan. This statement was false and misleading when made. Surinder Rametra later told investors, including plaintiff Giese, that the "sale proceeds were never earmarked, nor in fact used, for such a purchase." *Id.* ¶ 29.

### II. Stock Sales

The "Individual Defendants were ... motivated ... to inflate the price of ATEC stock to enable the sale by insiders of their positions in ATEC stock." *Id.* ¶ 50. They then "took advantage of the inflated price of ATEC stock to sell nearly two hundred thousand shares during the Class Period for proceeds in excess of $1.5 million." *Id.* These sales represented "approximately 8.5% of the entire market capitalization of the Company as of the commencement of this action." *Id.* ¶ 52. None of these sales were reported. *Id.* ¶ 50.

In January 1999, Ashok Rametra sold 46,500 shares of ATEC stock in three separate transactions, and, in violation of SEC Rule 16a 3, failed to disclose these sales to the public. In March and April 1999, Ashok Rametra, "seizing upon the market's ignorance of his undisclosed sales [ ] and the Company's inflated stock price," sold an additional 16,803 shares in six transactions. One of these sales occurred on March 25, 1999, six days before the close of the quarter "in which the Company later reported revenue and earnings performance well below expectations and results for the year-earlier period." *Id.* ¶ 33.

Days before the Nexar announcement on March 9, 1999, Surinder Rametra sold 15,561 shares and Ashok Rametra sold 9,000 shares of ATEC stock. *See id.* ¶ 39. In the following three weeks, Surinder Rametra sold an additional 50,000 shares in nine transactions and Ashok Rametra sold 5,800 shares in three transactions. *See id.* These sales "were made during the closing days of ATEC's third quarter ... for which defendants ultimately reported a 50% reduction in revenue and 90% reduction in earnings." *Id.* At the time, defendants were aware that the acquisition of Nexar would cost nearly $1 million, rather than the $300,000 cost reported. Surinder Rametra failed to disclose these stock sales to the public in violation of SEC Rule 16a 3. *See id.* ¶ 40. Rita Dozal and Frank Dozal, other Company insiders, sold 80,000 shares during the Class Period. *See id.* ¶ 51.

The individual defendants "had motive and opportunity to commit the alleged fraud." *Id.* ¶ 49. They "constituted the top management of the Company, and therefore had opportunity to make—and were directly responsible for—the false and misleading statements and/or omissions disseminated to the public through press releases, news reports, brokerage firms, and investment analysts." *Id.* They masked ATEC's "declining current performance and future prospects in order to create the illusion that ATEC was a successful, thriving growth company with a solid business foundation." *Id.* This was done to conceal ATEC's true financial condition from potential purchasers and merger partners, thereby "maximizing" the "share exchange ratio" of any merger and also enhancing "defendants' ownership interest in the newly merged entity—using ATEC's artificially inflated stock as currency in connection with such a merger." *Id.*

## III. Safe Harbor and Fraud on the Market

None of the statements made by defendants qualify for the statutory safe harbor provided to forward-looking statements because they either were not identified as "forward looking" when made, *see id.* ¶ 58, or failed to contain meaningful cautionary language identifying factors that could cause actual results to differ materially; furthermore, the makers of the statements knew they were false and misleading or the statements had been authorized by an ATEC executive who knew the statements were false when made. *See id.*

Defendants perpetrated fraud on the market because ATEC's stock was traded actively on the NASDAQ Small Cap Market System; the Company filed regular public reports with the SEC and NASDAQ; the Company communicated with investors by established market communications mechanisms; ATEC was followed by analysts at brokerage firms who reported on the Company's sales forces and customers, and "the market for ATEC stock promptly digested current available information regarding the Company from all publicly available sources and reflected such information in its stock price." *Id.* ¶ 56; *see id.* ¶ 55.

## DISCUSSION

■ In considering a motion to dismiss, the Court's task is " 'necessarily a limited one.' " *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir.1998) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). "Accepting all of the allegations in the complaint as true and drawing all reasonable inferences in favor of plaintiffs, *see Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir.1999), dismissal is proper 'only if it is clear that no relief

could be granted under any set of facts that could be proved consistent with the allegations,' *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)." *In re Scholastic Corp. Secs. Litig.*, 252 F.3d 63, 69 (2d Cir.2001).

## I. The § 10(b) and Rule 10b–5 Claims

### A. *Legal Standards*

■ As the Second Circuit recently reconfirmed:

> For a plaintiff to state a viable cause of action for securities fraud under § 10(b) ... and Rule 10b–5 ... the complaint must allege that in connection with the purchase or sale of securities, defendant, acting with scienter, either made a false material representation or omitted to disclose material information so that plaintiff—acting in reliance either on defendant's false representation or its failure to disclose material information— suffered injury and damages.

*Scholastic*, 252 F.3d at 69 (citing *Rothman v. Gregor*, 220 F.3d 81, 89 (2d Cir.2000)).[1]

■ In examining the sufficiency of a securities fraud claim, "conclusory allegations that [a] defendant's conduct was fraudulent or deceptive are not enough." *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 114 (2d Cir.1982). " '[E]verything but the kitchen sink' type[s] of pleadings ... would give plaintiff's attorneys *carte blanche* in the area of liberal federal discovery." *Id.* at 114–15. "Because the 'in terrorem' effect of such unfettered discovery would, to say the least, be substan-

tial, it is important that the wheat in plaintiff's pleading be separated from the chaff." *Id.* at 115.

■ The general standard for pleading fraud—equally applicable to claims under § 10(b) and Rule 10b–5—requires that "the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). A complaint alleging securities fraud "must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they were made." *Scholastic*, 252 F.3d at 69 70 (citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)). This is true regardless of whether a plaintiff's case revolves around one allegation of fraudulent conduct, *see, e.g., Rothman*, 220 F.3d at 84 (concerning one allegation that a computer software seller misrepresented its income by failing accurately to expense royalty advances), or multiple allegations. *See, e.g., Decker*, 681 F.2d at 111 (concerning multiple allegations of wrongdoing centering on the defendant's annual report). When there are multiple allegations, a court will pare the particular claims lacking specificity. *See id.* at 121 (affirming dismissal of all but two securities fraud claims because of insufficient specific allegations). "To satisfy Rule 9(b), however, a plaintiff need not plead dates, times, and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based." *In re Revlon, Inc.*

---

1. "Section 10(b) makes it unlawful '[t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.' " *Novak v. Kasaks*, 216 F.3d 300, 305 (2d Cir.2000) (quoting 15 U.S.C. § 78j(b)). "Rule 10b 5 specifies the following actions among the types of behavior proscribed by the statute: '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.' " *Id.* at 306 (quoting 17 C.F.R. § 240.10b–5).

*Secs. Litig.*, No. 99 Civ. 10192(SHS), 2001 WL 293820, at *8 (S.D.N.Y. Mar.27, 2001).

A plaintiff claiming securities fraud must also allege that a misrepresentation or omission is material. "[A]t the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir.2000) (quotation and citation omitted). "Material facts include those that affect the probable future of the company and [that] may affect the desire of investors to buy, sell or hold the company's securities." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir.2001) (citation and internal quotation omitted). Regarding omissions, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Ganino*, 228 F.3d at 162 (quotation and citation omitted). Dismissal due to immateriality is not warranted unless the misstatement or omission is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.*; *see Castellano*, 257 F.3d 171. While each allegation of fraud must be sufficiently particularized, allegations of materiality should not be considered in isolation. As stated in *Ganino*, "whether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case." 228 F.3d at 162; *see also Revlon*, 2001 WL 293820, at *9 (acknowledging the necessity of evaluating the materiality of an allegation of fraud in the context of all relevant circumstances).

The fraud particularity requirements of Rule 9(b) have been reinforced by the PSLRA. The PSLRA provides, in that regard, that a "complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Novak*, 216 F.3d at 307 (quoting 15 U.S.C. § 78u–4(b)(1)).

The PSLRA also articulates the pleading standard for scienter:

[i]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity *facts giving rise to a strong inference* that the defendant acted with the required state of mind.

*Id.* at 306–07 (quoting 15 U.S.C. § 78u–4(b)(2) (emphasis added)).

In *Novak*, the Second Circuit deduced that "enactment of [the PSLRA] did not change the basic pleading standard for scienter in this circuit (except by the addition of the words 'with particularity')" because "[t]he PSLRA adopted [the Second Circuit's] 'strong inference' standard." *Id.* at 311. The PSLRA, however, eschewed referencing Second Circuit language that the strong inference of fraud is sufficiently pled either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 306–07. Rather than adhere to this specific formulation, since it "conceals the complexity and uncertainty that often surrounds its application," the court in *Novak* instructed that "district courts should look to" the Second

Circuit's decisions for "guidance as to how the 'strong inference' standard may be met," rather than "employ or rely on magic words such as 'motive and opportunity.'" *Id.* at 310–11.[2] Culling from these precedents, the court noted that the requisite "strong inference" may arise when the complaint alleges that defendants "(1) benefitted in a concrete and personal way from the purported fraud ... (2) engaged in deliberately illegal behavior ... (3) knew facts or had access to information suggesting that their public statements were not accurate ... or (4) failed to check information they had a duty to monitor." *Id.*

Other scienter guidance has been provided. In *Ganino*, the circuit court concluded that although "speculation and conclusory allegations will not suffice, ... 'great specificity'" is not required "provided the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent.'" 228 F.3d at 169 (quoting *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir.1999)). Furthermore, a court may evaluate scienter allegations by examining them in the context of other allegations. *See Rothman*, 220 F.3d at 89 (finding adequate allegations of motive and opportunity because alleged conduct "in combination with the other allegations of the complaint, reenforces the adequacy of the complaint's allegation of scienter"). Finally, when "information contrary to the alleged misrepresentations is alleged to have been known by defendants at the time the misrepresentations were made, the falsity and scienter requirements are essentially combined." *Revlon*, 2001 WL 293820, at *7 (citing *Rothman*, 220 F.3d at 89–90).

## B. Application

Defendants advance a plethora of challenges to the securities fraud claims by contending that: 1) the complaint generally does not provide particular allegations that defendants' statements were untrue when made and does not disclose the sources of allegations based upon information and belief; 2) statements by defendants about ATEC's business conditions were expressions of optimism constituting puffery, forward-looking statements protected by the bespeaks caution doctrine and the PSLRA's safe harbor provision, and, at best, could only constitute fraud by hindsight; 3) defendants' statements concerning the purchase of Nexar were not material; 4) the allegations regarding the sale of ATEC are insufficiently particular to meet the heightened pleading requirements of Rule 9(b) and the PSLRA and, in any event, are not material; 5) the allegations regarding stock sales by the individual defendants fail to allege scienter, and the complaint generally fails to allege scienter based on recklessness or conscious misbehavior, and 6) defendants' statements regarding the sale of ATEC stock to purchase the Manhattan building were not fraudulent when made, and never reached the market. Defendants also argue that the complaint fails to state a "control person" claim under § 20(a), and must be dismissed since the underlying securities fraud claims are not viable. Finally, defendants assert that plaintiffs have not identified non-public material information to sustain their claim under § 20A.

Defendants' general attack against the complaint for failing to allege that defendants' statements were untrue when made and for failing to disclose the sources of allegations based upon information and be-

---

**2.** Nonetheless, the Second Circuit subsequent to *Novak* continues to use the traditional "motive and opportunity" and "conscious misbe-

havior and recklessness" rubric. *See Scholastic*, 252 F.3d at 74–77; *Rothman*, 220 F.3d at 90–94.

lief can be resolved with dispatch. Defendants simply find fault with paragraphs of the complaint that purport to do no more than summarize more specific allegations found elsewhere. The Court consequently turns its attention to defendants' specific challenges.

### 1. Disclosures, Omissions and Materiality

#### a. Business Conditions

Defendants contend that their statements about ATEC's business conditions were nothing more than expressions of optimism, see Defs.' Mem. at 6–8, and that " '[s]uch puffery cannot have misled a reasonable investor to believe that the company had irrevocably committed itself to one particular strategy, and cannot constitute actionable [conduct] under the securities law.' " Id. at 7 (quoting San Leandro Emer. Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 811 (2d Cir.1996)). It is true that " 'statements containing simple economic projections, statements of optimism, and other puffery are insufficient' to sustain a claim for securities fraud." Novak, 216 F.3d at 315.

██ The complaint alleges that in October and November 1998 and February 1999, defendants announced a new organizational structure for the Company and represented that it provided the "framework" for "organic growth" and the "blueprint" for "hyper-growth." Compl. ¶ 24. Defendants also stated that the Company "is poised for future growth," and that it occupies a "strategic position in the technology industry." Id. ¶ 25. Also, defendants represented that "management is intent on delivering record increases in revenue and earnings across the board in fiscal 1999," and that the Company is "position[ed] ... for dramatic revenue and earnings growth in the future." Id. ¶¶ 26, 34. Defendants furthermore observed

that the Company's "revenue and earnings growth model 'is still on track' " Id. ¶ 35. At the time defendants made these statements, defendants were aware that a "paradigm shift" in the industry had rendered "ATEC unable to obtain computers to resell from the manufacturers with whom it then dealt," thus hobbling the Company's basic health and making these statements untrue when made. Id. ¶ 28.

The line between puffery and actionable conduct sometimes is difficult to delineate. The parties each rely on Novak. In Novak, plaintiffs alleged that defendants made "materially false and misleading statements and omissions concerning the financial performance of [the defendant company], primarily by failing properly to account for millions of dollars of inventory" which defendants knew was "nearly worthless" but which they stated to be worth inflated values. Novak, 216 F.3d at 304. The court held these statements to be actionable because they "did more than just offer rosy predictions" about the company's future. Id. at 315.

In allegations somewhat closer to those in this case, plaintiffs in In re Computer Assocs. Class Action Secs. Litig., 75 F.Supp.2d 68 (E.D.N.Y.1999), alleged that company executives stated that their "business is stronger than ever," that there was "strong worldwide demand" for the company's products, that their "business fundamentals are strong," and that the company was "solidly positioned for growth." Id. at 73. The court determined that such comments were actionable as false and misleading because the executives failed "to disclose materially misleading adverse business trends." Id. By contrast, in Carman v. Liuski, No. 94 CV 1045(FB), 1996 WL 732825, at *3 (E.D.N.Y. Dec.18, 1996), this Court rejected plaintiffs' allegation that defendants stated that they remained "optimistic" that

their "favorable trend in revenues and earnings will continue throughout the year" *Id.* at \*2–3; *see also San Leandro,* 75 F.3d at 811 (general optimistic statements constituting inactionable puffery).

Plaintiffs did more than offer general optimistic statements about the Company's future performance. Defendants characterized ATEC's current and future business health in extremely positive terms, "while they allegedly knew the contrary was true." *Novak,* 216 F.3d at 315. Unlike the allegations rejected by this Court in *Carman* and the Second Circuit in *San Leandro,* plaintiffs allege more than mere expressions of "general optimism in light of a recent history of significant earnings." *Id.* As in *Computer Associates,* plaintiffs allege that defendants' positive characterizations of the Company's current and future business conditions were made while they were aware that an "adverse business trend" rendered those statements misleading. *Computer Assocs.,* 75 F.Supp.2d at 73. "Assuming, as we must at this stage, the accuracy of the plaintiffs' allegations," *Novak,* 216 F.3d at 315, defendants' statements were false and misleading.

■ Defendants further contend that their statements concerning business conditions are insulated by the PSLRA's "safe harbor" provision, which provides that a "forward-looking" statement will not be actionable if it is identified as such and is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." Defs.' Mem. at 8–9 (quoting 15 U.S C. § 78u–5(c)(1)(A)(i)). Defendants also invoke the "bespeaks caution" doctrine—that when forward-looking statements are accompanied by "risk disclosures that 'bespeak caution,' liability cannot be imposed as a matter of law even if

those risks materialize." *Id.* at 10 (citing, *inter alia, San Leandro,* 75 F.3d at 811).

■ Neither doctrine applies to allegations of misrepresentations of existing facts. *See In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 141 (S.D.N.Y.1999) (allegations of failure to disclose historical and existing material facts not immunized by safe harbor provision or bespeaks caution doctrine); *see also Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1213 (1st Cir. 1996) (*superceded by statute on other grounds* ) (forward-looking statements that encompass a "representation of present fact" not immune from liability); *In re APAC Teleservice, Inc. Secs. Litig.,* No. 97 Civ. 9145(BSJ), 1999 WL 1052004, at \*8 (S.D.N.Y. Nov.19, 1999) ("linking future success to present and past performance does not render statements immune from liability"). Plaintiffs allege that defendants knowingly misrepresented present material facts as part of forward-looking statements pertaining to ATEC's current and future business health. *See, e.g.,* Compl. ¶¶ 24, 25, 35. Consequently, defendants are not immunized by the safe harbor provision or bespeaks caution doctrine.

Defendants' contention that plaintiffs' allegations concerning defendants' statements of business-conditions amount, at best, to fraud by hindsight is misplaced. "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Novak,* 216 F.3d at 309. "[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Id.* Here, however, plaintiffs allege that defendants already knew that ATEC's core business was crumbling when they made misleading

statements about the Company's business health. *See* Compl. ¶¶ 8, 28, 42, 43.

### b. Nexar Technologies Acquisition

■ Regarding the March 1999 national conference call by ATEC's chief financial officer that the acquisition of Nexar assets would cost $300,000, plaintiffs assert that this comment required a corrective disclosure. Defendants contend that this statement was not material and, in any event, the actual cost of $1 million had become a matter of public record prior to that date—as early as January 1999; consequently, it did not require a corrective disclosure.

In regard to the public record, defendants rely on a January 22, 1999 article published in the Worcester, Massachusetts Telegram & Gazette. *See* Defs.' Mem at 12–13 (relying on the article in arguing that a corrective disclosure was not necessary); Aff. of Jay B. Kasner, Esq., July 19, 2001, Ex. M (attaching article). The article states that Nexar would sell its intellectual property to ATEC for $300,000 and that ATEC also had the option to buy Nexar inventory, valued between $400,000 and $500,000; thus making "the whole deal worth as much as $800,000." Kasner Aff. Ex. M. Therefore, defendants argue, it was a matter of public record that the actual cost of Nexar would be close to $1 million. *See* Defs.' Mem. at 12 (referring to the $800,000 as "nearly $1 million"). The article also states that the terms of the Nexar acquisition were subject to bankruptcy court approval; thus, defendants argue, the terms were available to the market. *See* Defs.' Mem. at 12.[3] It is questionable whether the Court can consider this article

on a Rule 12(b)(6) motion since it is neither attached to the complaint nor appears to be incorporated by reference. *See Yak v. Bank Brussels Lambert, BBL (USA)*, 252 F.3d 127, 130 (2d Cir.2001) ("On a motion to dismiss, the court may consider any written instrument attached [to the complaint] as an exhibit or any statements or documents incorporated in it by reference"). Even if the article be considered, both arguments are unavailing.

As for the first contention, defendants cannot draw any comfort from the information in the January 22, 1999 article concerning the acquisition cost because it was superceded by the March 1999 announcement. *See In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 268 (2d Cir.1993) ("One circumstance creating a duty to disclose arises when disclosure is necessary to make prior statements not misleading"). As for the second contention, the article is far from clear as to the nature of the disclosures presumably made to the bankruptcy court. The article simply states that "any party protesting the Nexar ATEC deal has until Feb. 12 to register objections .... [then,] [on] Feb. 16 [a judge] will rule on Nexar's motion asking the court to approve its assets-sale deal to ATEC." Kasner Aff. Ex. M at 2. In any event, filings in bankruptcy court proceedings do not equate to the types of corrective disclosures that would be expected to reach investors. *See generally Ganino*, 228 F.3d at 161; *see also American Insured Mortgage Investors v. CRI, Inc.*, Nos. 90 Civ. 6630(MBM), 90 Civ. 6716(MBM), 1990 WL 192561, at *9 (S.D.N.Y. Nov. 26, 1990) (corrective disclosures should be "communicated ... in a

---

**3.** The Court notes that the defendants' memorandum of law cites to Exhibit N of the Kasner affidavit in support of this argument. *See* Defs.' Mem. at 12. Having reviewed the exhibits, the Court concludes that the defendants intended to refer to Exhibit M since Exhibit N makes no mention of bankruptcy court proceedings and does not appear to be otherwise relevant.

manner reasonably likely to reach the [ ] attention" of investors).

Regarding materiality, as previously noted, materiality at the pleading stage must be viewed in light of plaintiffs' other allegations of material misstatements or omissions. *See Ganino,* 228 F.3d at 162; *Revlon,* 2001 WL 293820, at *9. Through that lens, the Nexar statements can be seen as part of a pattern of misstatements or omissions by ATEC executives designed to portray the Company's financial circumstances in an unrealistically favorable light. It would be inappropriate to dismiss the Nexar allegations at this point in the litigation on a materiality challenge.

### c. Sale of the Company

■ Defendants challenge the specificity of plaintiffs' fraud allegations regarding the sale of ATEC, concluding that plaintiffs do not provide the specific "who, what, where, when" concerning representations by ATEC that its purported sale was a "done deal." Defs.' Mem. at 16. The complaint, however, alleges that in mid January, early February, early and late March and early and late April 1999, Surinder Rametra, in conversations with members of the brokerage community, including Almodovar of Prime Charter, stated that the Company was for sale and, at one of these times, declared an acquisition to be a "done deal," even though a sale could not have been a "done deal" in light of ATEC's subsequent merger announcement. Compl. ¶¶ 30, 41.

The complaint consequently specifies the fraudulent statement (that a sale was a "done deal"); the speaker (Surinder Rametra); where the statement was made (in a conversation with brokers); when the conversations occurred (early and late March and early and late April 1999), and why the statement was fraudulent (the sale could not have been a "done deal" in light

of the subsequent merger agreement). While plaintiffs do not plead exact dates, they need not do so "with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based." *Revlon,* 2001 WL 293820, at *8. The allegations meet the "'primary purpose of Rule 9(b), [which] is to afford defendant[s] fair notice of the plaintiff's claim[s] and the factual ground upon which [they are] based.'" *Novak,* 216 F.3d at 314 (quoting *Ross v. Bolton,* 904 F.2d 819, 823 (2d Cir.1990)).

■ Defendants also argue that plaintiffs' allegations regarding the sale of ATEC fail to state a claim for securities fraud because there is no distinction between a merger and a sale and that, even if there were a difference, the marketplace was aware that ATEC was pursuing either a sale or merger; consequently, the distinction could not be material. Although a sale and a merger "may be functionally identical, ... the securities and tax laws will treat them very differently." *Westinghouse Elec. Corp. v. NLRB,* 809 F.2d 419, 422 (7th Cir.1987) (citing *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985)); *see also Engel v. Teleprompter Corp.,* 703 F.2d 127, 131 (5th Cir.1983) ("The terms 'merger' and 'stock acquisition' ... have two entirely different legal connotations").

As for the materiality of the allegations regarding the sale of the company, plaintiffs have alleged that the price of ATEC's shares dropped following the announcement of the merger with Wareforce.com because Wall Street had been expecting a sale. Compl. ¶ 41. A dramatic change in the value of a company's stock following a company announcement regarding the prospects of a merger supports the materiality of the announcement. *See, e.g., In re MCI Worldcom, Inc. Secs. Litig.,* 93

F.Supp.2d 276, 282 (E.D.N.Y.2000) (citing *Blanchard v. Edgemark Fin. Corp.,* No. 94 C 1890, 1999 WL 59994 at *12 (N.D.Ill. Feb.3, 1999) ("We cannot conclude at this stage of the litigation that the pre-merger negotiations were immaterial as a matter of law.... [I]t is clear that the merger had a dramatic impact on the value of the stock.... This fact alone demonstrates that the merger was an event of significant magnitude")). Moreover, when viewed in light of the other allegations of misstatements and omissions, the materiality of the allegations is reinforced.

### d. Building Purchase

 Defendants contend that the allegation that Surinder Rametra sold 70,-000 shares of ATEC stock on December 31, 1999 to purchase the building in Manhattan "cannot form the basis of a claim for securities fraud" because plaintiffs cannot faithfully allege that the statement was false when made, and that its disclosure to an "investment banking advisor" (Almodovar of Prime Charter) does not mean that "defendants knew or should have known that [Almodovar] further disclosed this alleged statement to the investing public." Defs.' Mem. at 14. "Communications that fail to reach the market or do so without a defendant's knowledge cannot support a securities fraud claim." *Id.* (citing *Wright v. Ernst & Young LLP,* 152 F.3d 169, 173–75 (2d Cir.1998)).

 The complaint alleges that during the class period Surinder Rametra disclosed to investors, including plaintiff Giese, that he never sold stock to purchase the building. Compl. ¶¶ 29, 53. Implicit in this allegation is that Surinder Rametra never intended to purchase the building and knew that the statement was false when made. As for communication with the market, the complaint alleges that the disclosure was not made simply to Almodo-

var but to the investing public through "members of the brokerage community, including ... Almodovar." *Id.* ¶ 29.

### 2. Scienter

 Defendants contend that plaintiffs have not adequately pled scienter because they have failed to allege facts giving rise to the strong inference that the individual defendants acted with the requisite state of mind. *See* Defs.' Mem. at 19–23. The complaint alleges, however, that defendants benefitted in personal and concrete ways when they artificially inflated the price of ATEC shares and when Surinder Rametra and Ashok Rametra covertly sold nearly 200,000 shares of ATEC stock for $1.5 million during the Class Period. *See* Compl. ¶¶ 29, 33, 39, 49, 50, 51, 52. Plaintiffs allege that the individual defendants sold tens of thousands of ATEC shares in the days just prior to the end of the second and third quarters of 1999, for which ATEC reported disappointing financial results. *See* Compl. ¶¶ 29, 33, 39, 51, 54. In addition, plaintiffs allege that these sales were not in compliance with SEC reporting requirements, and that the individual defendants did not sell any of their ATEC shares in the year before the Class Period. *See id.* ¶¶ 33, 40, 54.

 A generalized desire for financial benefit does not alone constitute scienter, *see Rothman,* 220 F.3d at 93, but "unusual insider trading activity during the Class Period may permit an inference of bad faith and scienter." *Id.* at 94; *see Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995). One example of "unusual" activity is " 'insider trading ... at suspicious times.' " *Ressler v. Liz Claiborne, Inc.,* 75 F.Supp.2d 43, 58 (E.D.N.Y.1999) (quoting *Rubinstein v. Collins,* 20 F.3d 160, 169 (5th Cir.1994); *In re Apple Computer Secs. Litig.,* 886 F.2d 1109, 1117 (9th Cir. 1989)). Plaintiffs' allegations are support-

ive of the strong inference alleged in the complaint that the individual defendants benefitted in a concrete and personal way from their fraudulent conduct.

Defendants raise additional scienter concerns. Invoking pre-PSLRA nomenclature, they contend that the complaint fails to allege recklessness or conscious misbehavior. As *Novak* instructed, parties and courts are best served by not registering dependency on pre-PSLRA labels, but by looking to the precedents of the Second Circuit for "guidance as to how the strong inference standard may be met." 216 F.3d at 310–11 (quotation and citation omitted). The Court views two decisions cited in *Novak* to be particularly instructive regarding what it perceives to be the main thrust of defendants' motion—that the statements regarding business conditions do not rise to the level of fraud or scienter.

In *Cosmas v. Hassett,* 886 F.2d 8, 12 (2d Cir.1989), "plaintiffs alleged that the defendants made or authorized statements that sales to China would be 'an important new source of revenue' when they knew or should have known that Chinese import restrictions in place at the time would severely limit such sales." *Novak,* 216 F.3d at 308 (quoting *Cosmas,* 886 F.2d at 12). In *Goldman v. Belden,* 754 F.2d 1059 (2d Cir.1985), plaintiffs alleged that "defendants released to the investing public several highly positive predictions about the marketing prospects" of a hotel computer telephone system despite the fact that defendants knew or should have known "several facts about the system and its consumers that revealed 'grave uncertainties and problems'" concerning the system's future sales. *Novak,* 216 F.3d at 308 (quoting *Goldman,* 754 F.2d at 1070). In each case, the facts alleged were sufficient to meet the scienter pleading requirements. The comparable facts and allegations in this case compel the same conclusion.

As previously noted, scienter allegations, like materiality, should be examined in the context of the other allegations in the complaint. *See Rothman,* 220 F.3d at 94. Plaintiffs' allegations regarding stock sales and business conditions, when viewed "in combination with the other allegations of the complaint," "reenforce[ ] the adequacy of the complaint's allegation[s] of scienter." *Rothman,* 220 F.3d at 94. This is especially true in this case where, in the main, the complaint pleads that "information contrary to the alleged misrepresentations is alleged to have been known by defendants at the time the misrepresentations were made." *Revlon,* 2001 WL 293820, at *7 (citing *Rothman,* 220 F.3d at 89–90).

## II. Other Claims

### A. The § 20(a) Claim

Plaintiffs' second claim alleges that the individual defendants should be held liable for false and misleading statements attributable to ATEC because they are "controlling persons" within the meaning of § 20(a). 15 U.S.C. § 78t(a). Defendants contend that this claim must be dismissed because "plaintiffs' underlying Exchange Act claims must be dismissed." Defs.' Mem. at 24 (citing *Lasker v. New York State Elec. & Gas Corp.,* 85 F.3d 55, 58 (2d Cir.1996)). Since the Court has determined that plaintiffs' securities fraud claims do not warrant dismissal, the § 20(a) claim survives.

### B. The § 20A Claim

Plaintiffs' third claim alleges that the individual defendants violated § 20A, which provides that a person who violates another provision of the statute through the sale or purchase of any security while possessing material nonpublic information is liable to any person that traded contem-

poraneously with the insider. *See* 15 U.S.C. § 78t 1(a); *Oxford Health,* 187 F.R.D. at 143. As previously noted, the complaint satisfies these requirements. *See* Compl. ¶¶ 30–40, 42–43, 48–50, 70–72.

## CONCLUSION

Defendants' motion is denied.

**SO ORDERED.**